JOHN T. WHITE v. ALFRED KEARNEY and another.

A copy of the clearance and manifest of a vessel, certified by a person styling himself the deputy collector of the port for which the vessel cleared, is not the best evidence, and should not be received, where the originals, and the person in possession of them, are within reach of the process of the court.

A deputy collector is not an officer authorized to certify copies of documents in his official capacity, and to make them evidence.

The admissions of a partner, previous to the dissolution of the partnership, are evidence against his co-partner: but when made after the dissolution, though in relation to a transaction commenced during its existence, and not completed when the admissions were made, they are inadmissible.

Where it was stipulated in a contract that the vessel on which a cargo was to be shipped to the purchaser, should go to sea by a particular day, and she was ready to sail on the day, but detained by bad weather for a few days, the purchaser will not be released.

Where a party to a contract is not put in default by the terms of the contract, nor by the operation of law, he can be put in default only by the commencement of a suit to compel a performance, by a demand in writing, by a protest made by a notary, or a verbal requisition made in the presence of, and proved by two witnesses. C. C. 1905.

Putting the party in default is a condition precedent to the recovery of damages for the violation of a contract.

The usage, on the neglect or refusal of a purchaser to come in a reasonable time, after notice, and pay for and take the goods, for the vendor to sell them at auction, and to hold the buyer responsible for the deficiency in the amount of the sale, is a fair one; but it is not the only mode of ascertaining tho damages, for a failure to comply with a contract.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.

GARLAND, J. The plaintiff alleges that he contracted with the defendants, Alfred Kearney & Co., through their agent, Alden Miller, to sell and deliver to them in New Orleans, sixteen hundred barrels of Thomaston lime, for which they were to pay

him at the rate of $1 48 per barrel, free of commissions. He says that he brought the lime to New Orleans, and offered it to the defendants, who refused to take it; he then had it sold, and now claims the sum of $768, as the difference between the price for which it sold, and that the defendants agreed to give for it. The firm of Alfred Kearney & Co. having been dissolved previous to the institution of the suit, it was brought against Kearney and Simms, as having lately composed the said firm. They answered separately. Simms, after a general denial, says that the letters to Miller, to prove his agency, were not written by, or in the name of the firm, and that he had no knowledge of them. He further says, if the letters are sufficient to prove the agency, that the directions contained in them were not complied with, nor was the contract, as the lime was not shipped in the time specified, and the loss ensued in consequence of it. The answer of Kearney denies the agency of Miller to contract for the firm, or any member of it; he denies the contract, and says, if any ever was made, that it has not been performed by the plaintiff, as the lime was not sent on, or before the 1st of September, 1843.

The evidence shews, that in 1842–3, Miller was a clerk for Kearney & Co., in whom they had great confidence. About the commencement of May, 1843, he was about to return to the State of Maine; but previous to his departure, Kearney told him that he would be glad if he would get for his firm a quantity of Thomaston lime, either by purchasing it for them, or to sell on commission. On the 24th of May, 1843, he writes to Miller, giving a long account of the business and prospects of his firm, and says: "If you have an opportunity of shipping lime at $1 25 or less, landed here, you may ship us, within thirty days after the receipt of this, from 600 to 1200 casks, and charge a commission on it, or take an interest in it." In a letter dated the 16th of June, he writes again about the business of his house. He tells Miller that the firm is to be dissolved on the 1st of October following, expresses his regret at not having lime to sell, and says: "Lime is very high and selling for $2 25 to $2 50. If you can send out a cargo on our account, joint account, or your own account, not to ex-

White v. Kearney and another.

ceed $1 37 1-2, landed here, do so, and we will pay you a com-
mission if you ship on our account. Don't let the cargo exceed
1600 barrels at the most; would prefer 800 or 900. If you
can send the lime any time before the 1st of September, it will
do—sooner the better, however—but not later." On the 24th
of June, a New Orleans price current was sent to Miller, on
the margin of which Kearney writes with a pencil: "Go as high
as $1 50 for the lime—K. & Co." On the next day Kearney
again writes to Miller, expressing his regret that his previous
limits were too low, and stating how much he could have
made if he had lime for sale. He then asks: "Have you not
done any thing yet; $1 50 ought to purchase a cargo. Dont
ship any lime on my account after the 1st September; between
this and then you may ship to the extent of 3000 casks." Whilst
this correspondence with Kearney was proceeding, Simms was
also writing to Miller in free and confidential terms. He in-
formed him that his connection with Kearney was to be dissolv-
ed, and of other matters; and expressed a strong desire to en-
gage him as a clerk in his new house, as also had Kearney;
but nothing was said about the purchase, or shipment of lime.
On the 16th of August, Miller, as agent of the defendants, pur-
chased the lime of the plaintiff, at the rate of $1 48 per cask,
the vessel to sail with it on, or before the 1st of September. On
the 17th of August, he wrote to Kearney & Co., informing them of
the purchase, and saying that he would have a written contract
before the vessel sailed. This letter it is proved that Simms
received, and he never disavowed the contract until after the
lime arrived. On the same day, Miller wrote to Kearney in
New York, informing him of the purchase; and he never dis-
avowed the act, until the vessel reached New Orleans. On the
31st of August, the plaintiff, and Miller, as agent of the defen-
dants, signed a written contract, in which it is stated, that the
former has agreed with the latter, to deliver to them in New
Orleans, from fifteen to eighteen hundred casks of lime, so soon
as the voyage can be made, the vessel being then "ready for
sea." Said Kearney & Co. to pay $1 48 per cask, on delivery.
It was further agreed that the brig, having the lime on board,
should be ready for sea on the morning of the 1st of September.

White v. Kearney and another.

On the same day, Miller enclosed this contract to the defen-
dants; which letter and contract was received by Simms, who
never repudiated it. The lime arrived in New Orleans about
the 1st of October, when the price had fallen very much. The
evidence of what occurred then in relation to an offer, on the
part of the plaintiff, to deliver the lime, is very meagre and un-
certain. No witness for the plaintiff swears to any direct offer
to deliver it. Gove, a witness for the defendants, says, that he
was their clerk, and recollects when the plaintiff arrived in New
Orleans. At the request of Kearney, he asked the captain of
the vessel that brought the lime, (who is the plaintiff,) when he
sailed; he replied, on the 5th of September; and on being ask-
ed if he cleared the day he sailed, he said that he did. Kearney
was present, and, witness supposes, desired him to ask the ques-
tion, that he might prove that the contract had not been com-
plied with. This conversation took place some days after the
plaintiff's arrival. Another person, unknown to witness, was
present; but the witness no where states, that the plaintiff, by
word or deed, tendered, or offered to deliver the lime, before he
placed it in the hands of Bridge to be sold. Bridge says, that
when the lime arrived it was only worth about one dollar per
cask. He sold the cargo—one thousand casks in one lot at one
dollar, and three hundred casks in another, at the same price,
and retailed some at nine bits. In the larger lot, Bridge be-
came interested with the purchaser, a day or two after the con-
tract to sell, before any lime was delivered, or paid for. One
hundred and thirty-three dollars, clear profit, was made by re-
selling the lime, which was done by Bridge himself. A witness
named Snow, who had had something to do with the contract
in Thomaston, on behalf of the plaintiff, and who had represent-
ed the defendants as fair and honorable men in their transac-
tions, says, that in November, 1843, soon after his return to the
city, he called on Simms, and asked why he had not taken the
lime; that he replied, the first knowledge he had of the trans-
action, was when the plaintiff offered him the cargo; and that
he did not consider himself under any obligation to receive it,
or pay the damage. This witness also had various conversa-
tions with Kearney about the lime, who said, that his reason for

White v. Kearney and another.

not settling the matter, was, that he could prove that the contract had not been complied with by the plaintiff, as he did not sail, or clear out, until the 5th of September.

The evidence is conclusive, as to the fact, that the lime was all on board the vessel previous to the 1st of September. Miller says, that it was all on board on the 29th of August, and that the vessel hauled out into the stream. Snow says the same thing. In the written contract, dated the 31st August, it is stated that the vessel is ready for sea. Snow says, that he saw the plaintiff at the custom-house on that day, and that he said he had every thing ready, except a few supplies. A copy of the clearance of the vessel was admitted in evidence, subject to exception, which is dated the 31st of August. It is also proved, that on the 1st of September, the wind was such as to prevent any prudent master of a vessel from attempting to go to sea, from Thomaston, and that it continued so until the 5th, when the vessel sailed. The defendants also proved by a clerk, and an exhibit of a statement of sales made by themselves, that lime, about the time of the arrival of the cargo in controversy, was selling at from $1 25 to $1 50, per cask.

The court gave a judgment in favor of the plaintiff for $768, and the defendants have appealed.

Our attention is first called to a bill of exceptions, taken on various grounds, to the opinion of the court below, permitting a copy of the vessel's clearance and manifest from the custom-house in New Orleans, certified by a person styling himself deputy collector, to be read in evidence. We shall not notice all the objections taken, as the one, that it is not the best evidence that could have been produced, is sufficient, and should, in our opinion, have induced the judge to reject it- The best evidence was the original. It, and the person having it in possession, were within the jurisdiction of the court, in reach of its process; and we are not aware of the law, that authorizes a deputy collector of the customs, to certify copies of the clearances of vessels from other ports, and thus make them evidence in our courts, whilst the deputy, and the documents, are within their jurisdiction, and amenable to their process. We do not think a deputy collector of the customs, is such an accredited

officer as will authorize him to certify copies of documents in his official capacity, and make them evidence.

The next bill of exceptions is taken by Kearney alone, to permitting a witness to testify to the declarations of Simms, in a conversation with the witness, held sometime after the dissolution of the firm of Kearney & Co., because he says, he is not bound by such declarations. The judge admitted the declarations and statements of Simms to be given in evidence, "because the transaction had commenced during the existence of the partnership, and had not been completed at the time the declarations were made." We think the judge did not err in permitting the admissions of Simms as to any acts, or transactions that took place previous to the dissolution of the partnership; but as to what took place afterwards, his acknowledgments do not bind Kearney. When the vessel, with the lime on board, arrived in New Orleans, the partnership had been dissolved, and each partner was afterwards responsible for his own acts; and the admissions of one as to what subsequently took place between himself and the plaintiff, or a third person, are not binding on the other.

Upon the merits of the case, we are clearly of opinion that Miller was authorized, as the agent of the firm of Kearney & Co., to purchase the lime for them, and that in doing so, he did not exceed his powers. We are also of opinion, that it was shipped, and the vessel ready for sea, on or before the 1st of September; but that she was prevented from sailing by adverse winds. The fact of her not clearing on, or before that day, we do not consider of much importance, as it was not necessary, when it was evident she could not go to sea. The clearance could be effected in a very short time, the proposed voyage being a coasting one, and the cargo all consisting of one article, consigned to the same persons, to wit, the defendants. But the evidence as to the defendants being put in default, is far from being conclusive. Article 1905 of the Civil Code provides, that when the party is not deemed to be in default, by the terms of the contract, or operation of law, then the act of the party is necessary; and four modes of putting him in default are mentioned, with not one of which has the plaintiff shown that he

has complied. He has not commenced a suit to compel a performance of the contract; no demand and protest have been made by a notary public; no requisition in writing has been exhibited, nor evidence of a demand made in the presence of, and proved by two witnesses. As to Kearney, there is no evidence that the plaintiff ever made an offer to deliver him the lime, or called on him to receive it; and the only evidence as to Simms, is his statement to Snow, that the reason he did not take the lime was, that he never heard of the contract until the plaintiff offered it to him. This statement was made more than a month after the plaintiff arrived with the lime, and after it was placed in the hands of Bridge to sell. This admission of Simms was in no way binding on Kearney, and proof of it by a single witness, is not, in our opinion, a sufficient compliance with the law, which requires that a verbal demand shall be made in the presence of two witnesses, and is necessarily to be proved by them. The putting the party in default, is a condition precedent to the recovery of damages for the violation of a contract (3 Robinson, 400); and must be proved in all cases. In the present case, the evidence is too weak upon this point, to sustain the judgment.

Besides the objection of the defendants' not being put in default, we are of opinion that the evidence as to the amount of damages is weak and suspicious. The lime was put into the hands of Bridge to sell; he swears that it was only worth one dollar per barrel, and that he sold one thousand barrels at that rate; and, in a day or two after, before any lime was delivered, or paid for, he admits that he became interested with the purchaser, and made a speculation by selling it out again. We do not think the measure of damages should be established by such a proceeding as this, particularly when the defendants show, that lime was worth more in the market at the time. Chancellor Kent, in speaking of cases of this kind, says: "If the buyer unreasonably refuses to accept of the articles sold, the seller is not obliged to let it perish on his hands, and run the risk of the solvency of the buyer. The usage on the neglect, or refusal of the buyer to come in a reasonable time, after notice, and pay for and take the goods, is for the vendor to sell the same at auc-

tion and to hold the buyer responsible for the deficiency in the amount of sales." 2 Kent's Comm. lect. 39, 397. 5 Johns. Rep. 395. 5 Sergt. & Rawle, 19, 32. This rule is, we think, a fair one; but it is not to be considered as the exclusive mode of ascertaining the amount of damages for failing to comply with contracts.

Upon a review of all the circumstances of this case, we think that justice will be best attained by remanding the case for a new trial.

The judgment of the Commercial Court is, therefore, annulled and reversed, and the case remanded for a new trial, with directions to the judge to proceed therein in conformity with the principles herein stated, and otherwise according to law; the plaintiff paying the costs of this appeal.

*W. S. Upton*, for the appellant.

*Kennedy* and *Elwyn*, for the defendants.