63 So.2d 144

FRIEDMAN IRON & SUPPLY CO. v. J. B. BEAIRD CO., Inc.

No. 40256.

Feb. 18, 1952.

On Rehearing July 3, 1952.

On Second Rehearing Jan. 12, 1953.

Smith, Hunter, Risinger & Shuey, Shreveport, for plaintiff-appellant.

Melvin F. Johnson and Johnson & Morelock, Shreveport, for defendant-appellee.

HAWTHORNE, Justice.

Plaintiff, Friedman Iron and Supply Company, instituted this suit against J. B. Beaird Company, Inc., praying that the defendant be judicially ordered and condemned to accept delivery of 500 tons of scrap steel at $41 per ton and to pay the sum of $20,500, and praying in the alternative for damages against the defendant for breach of the contract to purchase the steel.

Plaintiff's suit for specific performance was dismissed on exception of no cause of action and has now been abandoned by plaintiff. In due course, after trial on the merits, the lower court rendered judgment denying plaintiff's alternative plea for damages and dismissing its suit. Plaintiff has appealed.

The record in this case clearly establishes that during the month of February, 1949, plaintiff and defendant entered into a binding contract by which plaintiff was to sell to defendant 500 tons of scrap steel at a price of $41 per gross ton, to be delivered on various dates as specified by the defendant in its acceptance of plaintiff's offer to sell. The record also discloses that on March 7, 1949, defendant notified plaintiff not to ship any of the scrap steel until requested in writing so to do, and, according to· defendant, on March 8 it cancelled in writing its order for the purchase of this scrap steel in its entirety. On March 12 plaintiff requested the defendant to accept the scrap steel which it had purchased, assembled, stockpiled, and allocated for sale to the defendant. Defendant refused to· accept the steel and pay the purchase price,. and plaintiff instituted this suit.

In its petition plaintiff alleged that it had retained the entire 500 tons of scrap· steel on its yard, segregated, stockpiled,. and allocated to fill the contract order with defendant; that this amount of steel so· segregated, stockpiled, and allocated on its yard was awaiting shipment to defendant,. and that delivery had been tendered and refused.

The lower court denied the plaintiff recovery, holding that under the law as announced by this court in Mutual Rice Co·. of Louisiana v. Star Bottling Works, Ltd.,. 163 La. 159, 111 So. 661, 663, and followed. by one of the Courts of·Appeal in Scott Mfg. Co. v. Stoma, 10 La.App. 469, 121 So.. 335, an actual resale by the plaintiff was a. condition precedent to an action for damages in a case such as this.

An examination of the Mutual Rice Co.. case shows that the part of the decision relied on by the trial judge is purely obiter dicta. In that case plaintiff was suing for damages for an alleged breach by the defendant of a contract to accept and pay for two carloads of sugar. After reviewing all of the evidence this court concluded that the negotiations for the sale of the· sugar between the plaintiff and the defendant *had not become a completed contract.* After so concluding, however, the court, assuming for the sake of argument that

the negotiations had reached that stage, went on to say that, "* * * When a buyer breaches the contract of sale, the measure of damages which the seller is entitled to is the difference between the price stipulated in the contract and the market price at which the goods can be readily sold at the time and place of delivery; and it is the *duty* of the seller to minimize his loss by reselling the goods as soon as practicable after the buyer has refused to accept". The following cases were cited by the court as authority for that statement: Bartley v. City of New Orleans, 30 La.Ann. 264; Jochams v. Ong, 45 La. Ann. 1289, 14 So. 247; Robinson Lumber Co. v. W. O. & C. G. Burton, 128 La. 120, 54 So. 582; C. F. Bonsor & Co., Inc., v. Simon Rice Milling Co., 151 La. 1094, 92 So. 711; National Wholesale Grocery Co. v. Simon Rice Milling Co., 152 La. 1, 92 So. 713; J. H. Garrison & Son v. Sherill Hardwood Lumber Co., 156 La. 147, 100 So. 253; Wertham Bag Co. v. Roanoke Mercantile Co., Ltd., 157 La. 312, 102 So. 412; Burglass v. J. C. Healy Co., Inc., 159 La. 393, 105 So. 384. Not one of these cases, however, makes it the *duty* of the seller to minimize his loss by reselling the goods as soon as practicable after the buyer has refused to accept as a condition precedent to instituting suit for damages for breach of the contract. (All italics ours.)

For instance, in Bartley v. City of New Orleans, the first case cited, plaintiff sued the city for the breach of a contract for the sale and delivery of timber. After the breach of the contract plaintiff sold the timber. In the course of the opinion this court said: "It is objected on the part of the city that plaintiff could not sell at private sale for her account and risk. This may be true; but it is shown that he got for the timber all he could in the then state of the market, and as the city would not take the timber, he had a *right* to sell it for his own account, and claim from the city as damages the losses sustained."

The other cases cited are authority merely for the general rule for measurement of damages for the breach of a contract of sale.

Plaintiff-appellant relies on the case of Wilbor v. M'Gillicuddy, 3 La. 382, for the proposition that a resale is not required of the plaintiff as a condition precedent to the recovery of damages. Plaintiff in that case sued to recover from the defendant damages for failure to comply with the contract by which the defendant was to purchase a certain quantity of molasses hogsheads at a fixed price. This court said: "Again it was urged [by the defendant], that no damages were proved, because the plaintiff had not shown he had *re-sold* the same merchandise, and sustained a loss by doing so. A re-sale is certainly one way of establishing the injury arising from breach of contract, *but it is not the sole way.* If it were, then it would follow, that where a second sale could not be made at all, the vendor would be in a worse position than

if he had readily found another purchaser at a slight diminution of price."

In White v. Kearney, 9 Rob. 495, plaintiff sued the defendants for the breach of a contract to purchase lime. After he had tendered the lime to defendants, who refused to accept it, he then sold the lime and claimed as damages the difference between the price at which it sold and that which the defendants had agreed to give for it. In the course of the opinion in that case this court said: "* * * Chancellor Kent, in speaking of cases of this kind, says: 'If the buyer unreasonably refuses to accept of the articles sold, the seller is not obliged to let it perish on his hands, and run the risk of the solvency of the buyer. The usage on the neglect, or refusal of the buyer to come in a reasonable time, after notice, and pay for and take the goods, is for the vendor to sell the same at auction and to hold the buyer responsible for the deficiency in the amount of sales.' * * * *This rule is, we think a fair one; but it is not to be considered as the exclusive mode of ascertaining the amount of damages for failing to comply with contracts."*

Although we know of no case in our jurisprudence which requires an actual resale by the seller as a condition precedent to an action for damages for breach of the contract, under the established jurisprudence of this court the vendor in such a case *may* sell, or has the *right* to sell, to establish the quantum of damages, but he is not bound or obliged to do so, and such resale is not the sole way of determining or measuring the damages. *In the event he elects to resell, he should do so at the earliest practicable moment after the buyer's absolute refusal to accept or within a reasonable time after the contract is breached, and such sale should be made at the prevailing market price.* Jochams v. Ong, supra. In the event he elects not to resell but to keep the goods, he does so at his own risk, as he cannot by keeping the object of the contract speculate on the market price thereof, to the detriment of the purchaser, because damages under these circumstances would not be such as were within the contemplation of the parties when the contract was made. See Robinson Lumber Co. v. W. O. & C. G. Burton, supra; National Wholesale Grocery Co. v. Simon Rice Milling Co., supra; J. H. Garrison & Son v. Sherill Hardwood Lumber Co., supra.

In the instant case plaintiff contends that it is entitled to recover for the breach of contract the difference between the contract price and the market price on the date of breach, which it alleges to be an amount between, approximately, $8000 and $14,000, the exact amount depending on the prevailing market price on the date which this court should determine as the date on which the contract was breached. The difference between the contract price and the prevailing market price on the date of breach is recognized as one means of measuring the amount of damages, but that rule will not correctly measure the damages in

the instant case because, under the particular facts here, we have concluded that the plaintiff has not sustained any damages whatsoever, and that the trial judge was correct in dismissing its suit.

*The primary aim or principle of the law of damages for a breach of contract is to place the plaintiff in the same position he would be in if the contract had been fulfilled, or to place the plaintiff in the position he would have occupied had the breach of the contract not occurred.* When this is accomplished, the primary aim or principle of the law of damages has been fulfilled.

In Goodloe v. Rogers, 9 La.Ann. 273, this court said in discussing the measure of damages:

"The measure of damages for the inexecution of contracts, as we have seen, by Article 1928 of the Louisiana [Civil] Code, is the amount of loss sustained by the obligee, and profit of which he has been deprived, subject to the modification that when there is no bad faith or fraud, the obligor is liable only for damages that may reasonably be supposed to have been contemplated by the parties at the time of the contract.

"The rule with its modification, is taken verbatim from the Code Napoleon, Articles 1149 and 1150. And those Articles of the French Code in turn, were borrowed from Pothier on

Obligations, No. 159 and 160. It must not be supposed, however, that Pothier was the author of the rule. He tells us himself that it is as old as the Roman Law, and gives us the text of the Pandects in which it was expressed. It is known to American jurists by the name of Consequential damages; and those are distinguished into proximate and remote. Mr. Sedgwick, in the third chapter of his treatise on the measure of Damages, has collected authorities on this subject from many different quarters. From his researches, it appears that the doctrine of the civil and common law is not materially different. * * *"

Further, in Gauthier v. Green, 14 La. Ann. 788, it was stated:

"The general rule for the measure of damages for inexecution of a contract, by Article 1928 of the Code, is the loss suffered, or the profit of which the obligee has been deprived. * * *"

McCormick on Damages states the primary aim or principle of the law of damages as follows:

"The primary aim in measuring damages is compensation, and this contemplates that the damages * * * for breach of contract should place the plaintiff in the position he would be in if the contract had been fulfilled." Sec. 137, p. 560.

Williston states also that the general principle is that the measure of damages

for breach of an obligation is the sum which will put the plaintiff in as good a position as he would have been in if the obligation had been fulfilled. 3 Williston on Sales, sec. 599, p. 293.

In the instant case the contract was entered into in February of 1949 and provided for 500 tons of scrap steel at $41 per ton. The breach of this contract occurred during March or April of the same year, the exact date being immaterial under the conclusion which we have reached. Suit was instituted on July 1, 1949, and trial was actually begun on June 27, 1950, more than a year after the time of breach. At that time, according to plaintiff, it had stockpiled and segregated the steel and had it on its yard awaiting delivery to defendant. According to plaintiff's own witness, Mr. Joseph A. Creevy, field representative for Youngstown Sheet and Tube Company, the market price for scrap steel of the kind which was the subject of the contract was from $47 to $47.50 per ton at the time of the trial, or an amount from $6 to $6.50 more than the price called for in the contract. Under these circumstances, for the district court to have permitted the plaintiff to recover damages in *any* amount (much less the sum of from $8000 to $14,000 for which it prayed) *would have placed it in a much better position than it would have been in if the contract had been fulfilled*, because plaintiff still had the scrap steel which was the object of the contract, for which there

was a market at a greater price than the defendant had promised to pay. An award of damages here, rather than placing the plaintiff in the same position it would have been in if the contract had been fulfilled, which is the primary purpose or principle of the law of damages, would enrich the plaintiff because of the breach of the contract, and, further, would award plaintiff as damages an amount in excess of that reasonably supposed to have been contemplated by the parties at the time of the contract. This, as pointed out by the foregoing authorities, is not the purpose of awarding damages.

In conclusion, we agree that the rule urged by the plaintiff that damages for the breach of a contract of sale are measured by the difference between the contract price and the market price on the date of breach is well recognized, and generally its application will accomplish the primary aim in measuring damages; that is, ordinarily it will operate to place the plaintiff in a case such as this in as good a position as he would have been in if the contract had been fulfilled. But, as pointed out hereinabove, application of this rule to the facts of the instant case will not accomplish this result.

For the reasons assigned, the judgment appealed from is affirmed at appellant's costs.

HAMITER, J., concurs in the decree.

On Rehearing

PONDER, Justice.

. The plaintiff contends that we erred in using the market value of scrap. steel at the date of the trial as a criterion in determining whether it had suffered a loss or been deprived of a profit as a result of the defendant's breach of contract. The plaintiff takes the position that the true measure of damages is the difference between the contract price and the market price of the scrap steel on the date the contract was breached.

The defendant purchased 500 tons of scrap steel from the plaintiff at a price of $41 per gross ton, to be delivered in carload lots on specified dates between April 4 and June 6, 1949. On March 8, 1949, prior to the delivery of the scrap steel, the defendant notified the plaintiff, by letter, that it was cancelling the order in its entirety. On March 12th, the plaintiff. requested the defendant to accept the scrap steel and the defendant thereafter refused to accept it or pay the purchase price. In this suit the plaintiff is seeking to recover damages for the breach of the contract.

Under the provisions of Article 1934, LSA–Civil Code, the damages due the plaintiff for the defendant's breach of the contract is the amount of the loss the plaintiff has sustained and the profit of which it has been deprived, except, in the absence of fraud or bad faith, the defendant is liable only for such damages as were contemplated or may have reasonably been supposed to have entered into the contemplation of the parties at the time the contract was entered into. It is presumed, in the sale of personal property, that the parties contemplated the difference between the contract price of the thing sold and the market value at the time and place at which it was to be delivered when they entered into the contract. Robinson Lumber Company v. W. O. & C. G. Burton, 128 La. 120, 54 So. 582 and the authorities cited therein. This court has on numerous occasions pointed out that the measure of damages for the breach of a contract of sale, where no fraud is shown, is the difference between the contract price and the market price of the goods on the *date of the breach*. See Interstate Electric Company v. Frank Adam Electric Company, 173 La. 103, 136 So. 283 and the authorities cited therein to that effect. This rule of law is based on solid grounds because neither a plaintiff nor a defendant should be permitted to select the market value of a date different from that on which the contract was breached for the purpose of determining whether any loss was suffered or profit deprived to the detriment of either party. The facts in this case amply demonstrate the reasonableness of and the necessity for this rule. The defendant breached its contract when it saw the market for scrap steel was rapidly declining. At the time the suit was tried, more than a

year after the contract had been breached, the price for scrap steel had advanced in excess of the price called for in the contract. The record shows that scrap steel had continued to decline for more than two months after the contract was breached but it does not show when the prices took an upward trend. If the suit had been tried at an earlier date when the market price of steel might have been on the further decline, the defendant's liability would have been greater if the value of the steel at the date of the trial was to be used as a criterion in determining whether the plaintiff had suffered a loss or been deprived of a profit. If such were to be used as a criterion, the rights of the parties would depend on conditions arising at an uncertain future date. In fact, it would leave the rights of the parties uncertain and encourage litigants to jockey for a trial on a date when the market was favorable. The rule, that the measure of damages for the breach of the sale of personal property is the difference between the contract price and the market price at the date of the breach of the contract, is a salutary one and does not depend on uncertain events that may occur sometime in the future.

There is dispute in the evidence as to the date the contract was breached but we have arrived at the conclusion that the plaintiff received notice of the cancellation of the contract on March 9, 1949. This is borne out by the fact that the plain-

tiff consulted attorneys as to its rights under the contract within three or four days after that date. While there is dispute as to the market value of the scrap steel on March 9th, we have reached the conclusion that the testimony produced by the plaintiff, based on the trade journal "The Iron Age", which is the accepted trade journal of the iron and steel industry, that the price quotations for scrap steel listed from date to date therein are accepted in the trade as being reliable and authentic and that they serve as a basis for the buying and selling of scrap steel. This publication bases its prices on the Pittsburgh market, which is the center of the buying and consuming of scrap steel, and, of course, if these prices are to be the guide it is necessary to deduct the freight charges from Shreveport to Pittsburgh in order to determine the value of this scrap steel now located in Shreveport. On March 9, 1949, No. 1 scrap steel was listed at $36.50 to $37 per ton and phosphate steel was listed at $42 to $43 per ton. The scrap steel specified in the contract involved herein is a type of scrap especially selected and prepared for small electric furnaces similar to that of defendant's which has no premium value to large mills and according to the testimony of the expert witness, who testified in behalf of the plaintiff, it is bought and sold in the market as No. 1 steel except when there exists a scarcity of scrap steel which compels the Pittsburgh buyer to pay the premium low phosphate price in order to ob-

tain the scrap steel. At the time the contract was breached, the market was declining rapidly and a seller could only expect to receive the prevailing price of No. 1 steel. The highest price for No. 1 steel at Pittsburgh on the date of the breach was $37 per ton and the cost of freight to ship it to the Pittsburgh market on that date was $13.3248 per ton. Under the contract the defendant was to pay $41 per ton for the scrap steel. At the date of the breach of the contract, the steel was worth $37 per ton at Pittsburgh. Deducting the freight charges from Shreveport to Pittsburgh of $13.3248, the steel would have had a market value at Shreveport of $23.6752 per ton. The contract price called for $41 per ton. After deducting the present market value at Shreveport, the plaintiff suffered a loss of $17.-3248 per ton on the steel. The contract calling for 500 tons, the loss suffered by the defendant would be $8,662.40. The plaintiff is entitled to recover this amount as it is the difference between the contract price and the market value of the steel at the date the contract was breached.

■ Under the provisions of Articles 1932 and 1933, LSA–Civil Code, damages are due from the moment that there is an active violation of the contract and the creditor is not under obligation to place the debtor in default, but when the breach is passive only it is necessary to place the debtor in default. Irrespective of whether the cancellation of the contract is considered as an active violation or a passive violation of the contract, there would be no necessity to place the defendant in default because it would have been a vain and useless thing after the defendant had notified the plaintiff that it did not intend to comply with the contract by ordering its cancellation.

For the reasons assigned, the decree heretofore handed down is reversed and set aside. The judgment of the district court is reversed and set aside. It is ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant in the sum of $8,662.40 with legal interest from judicial demand. All costs to be paid by the defendant. The right to apply for a rehearing is reserved to defendant.

HAMITER and HAWTHORNE, JJ., dissent.

### On Rehearing

HAWTHORNE, Justice (dissenting).

In this case, had the contract been consummated, the plaintiff would have received for 500 tons of scrap steel at $41 per ton the sum of $20,500. The identical 500 tons of steel were in possession of the plaintiff at the time of trial and had at that time a minimum market value of $47 per ton, so that the steel had a value of $23,500 or a sum in excess of the total contract price of $3000. This amount, together with the award of $8662.40 granted

to it in the majority opinion, permits the plaintiff to realize as of the day of the trial more than $11,000 above the contract price of the steel. In other words, by virtue of the breach of the contract the plaintiff is permitted to retain the steel and realize a sum in excess of $11,000 above the contract price.

Does this result accomplish the primary aim or principal purpose of the law of damages for the breach of a contract, which is to place the plaintiff in the same position he would be in if the contract had been fulfilled or the breach had not occurred? Obviously it does not.

I adhere to the views expressed in my original opinion.

## On Rehearing

HAMITER, Justice (dissenting).

As I view this case there were two alternatives available to plaintiff on defendant's breach of the contract. It had the right either (1) to try to place itself in as good position as it would have been if the contract had been carried out, claiming as damages any resulting difference; or (2) to retain the scrap steel and have the opportunity of speculating on the market price thereof.

A resort to the first alternative required that plaintiff make reasonable efforts to mitigate or reduce the damages. 15 American Jurisprudence, verbo Damages, Section 30; 25 C.J.S., Damages, § 34.

For accomplishing this it was necessary that a good faith attempt be made for the sale of the material (there was a market for it, although a highly fluctuating one) at the earliest practicable moment after the buyer's absolute refusal to accept. And the damages recoverable would be the difference between the contract price and the market price at the time of the bona fide attempt to sell (whether the sale be effected or not).

But plaintiff made no attempt whatever to sell and to minimize the damages. Rather, it elected to pursue the second alternative of retaining the scrap steel. And at the time of the trial, occurring more than a year after the contract's breach, the material was still in its possession with a market value in excess of the agreed purchase price.

Having elected to keep the scrap steel indefinitely, the value of which is governed by a fluctuating market, plaintiff, in my opinion, is not entitled to recovery herein. Damages under these circumstances would be purely speculative and of the kind not contemplated by the parties when entering into the contract.

I respectfully dissent.

### On Second Rehearing

LE BLANC, Justice.

Availing itself of the right reserved to it, the defendant applied for and was

granted a rehearing, limited however, to the issue of the amount of damages.

There are three issues to be considered in disposing of this rehearing: (1) Is the plaintiff restricted to the amount of damages prayed for in its supplemental petition which is smaller than that demanded and prayed for in its original petition? (2) Was there a market for scrap iron material in the Shreveport area at the time of the breach of the contract which could have been used in determining the market value on which the damages for the breach can be fixed? (3) Assuming there was no Shreveport market and that the damages have to be based on the quotations of the Pittsburg market, less freight costs and charges, has the Pittsburg market as of the date of the breach, March 9, 1949, been proved?

Taking up these points in the order just presented, regarding the first it is hardly necessary to have to state that a plaintiff cannot recover a greater amount than what he prays for. That is elementary. In this case, plaintiff originally sought specific performance of the contract sued on and, in the alternative, it alleged damages for breach of the contract in the sum of $12,250. Inadvertently, we presume, the amount prayed for was $12,500. A question was then presented under the pleadings concerning the actual date on which the breach occurred. In a second supplemental petition, filed with leave of court, it alleged, in one of several alternatives, that if the breach occurred on March 9, 1949, it was "damaged in the amount of the difference between the contract price of $41 per ton and the market value to the plaintiff for $28.28 per ton, amounting to $12.72 per ton or a total damage of $6,360 on the 500 tons specified in the contract," and it prayed accordingly. In a third supplemental petition it asked for judgment "as prayed for in the original petition as the same has been amended and supplemented."

As this Court has definitely and finally fixed the date of breach as of March 9, 1949, the award necessarily has to be limited to the amount prayed for as for breach on that date unless, as counsel for plaintiff now contend, the amendment to the petition and its prayer was forced on it by an order of court and, besides, the pleadings were enlarged by the introduction and admission of evidence without objection.

There is no merit to the point that because the amendment to the petition and the prayer were made in compliance with an order of Court plaintiff is not bound by that prayer. A plaintiff is always required to specify the damages he claims and to state exactly what they consist of and how the amount is arrived at. This is all that the plaintiff was properly required to do in this case. It supplied the necessary allegations and has to be held to them and to its prayer made in accordance with them.

Neither is there any merit to the contention that the pleadings have been en-

larged by the admission of unobjected to testimony. The rule on this point, as stated in City of Shreveport v. Chatwin, 139 La. 531, 71 So. 791, 792, is that "evidence received without objection enlarges pleadings only when it would not have been admissible if objected to". That rule governs this case as certainly evidence regarding the Pittsburg market, less freight, was admissible even over objection, to show market value as of March 9, 1949, the date of breach.

We are convinced that plaintiff, if entitled to damages, is limited to the amount of $6360 as prayed for in its supplemental petition.

Taking up now the second point to be considered, we might say, without entering into a lengthy discussion of the testimony that whatever proof there is to show sales of scrap iron material in and around Shreveport, it is far from sufficient to show any established market for that commodity in that area. Just a few sporadic sales with only one substantial dealer in a given area is not sufficient to create a market in the sense in which that term is here to be applied. The preponderance of the testimony is that the recognized market for the country is the Pittsburg market and the quotations of that market, less the freight charges from the point of shipment to Pittsburg, are the accepted market quotations.

On the third point mentioned, counsel for defendant maintain that plaintiff did not prove what the Pittsburg market was on March 9, 1949, the date of the breach. They point out that it endeavored to prove the quotations of that market by introducing in evidence issues of The Iron Age Magazine, the trade journal in the iron and steel industry, which is correct, but that whereas issues beginning with that of February 3, 1949 and ending with that of April 21, 1949, were offered and introduced, it failed to supply the issue of March 9, 1949. True it is that the issue of that date was not introduced but the one of March 10, 1949 was, and as the market quotations carried in a trade journal or a newspaper on a given date are usually the quotations of the day previous we are satisfied that the market price of March 9, 1949 as fixed in the opinion on first rehearing, which are those quoted in The Iron Age of March 10, 1949, are correct and were properly accepted as the market value on which to determine the amount of damages in this case. Notwithstanding this however, the decree, by oversight, awarded the plaintiff more than it had prayed for and it will have to be amended accordingly.

For the reasons stated it is ordered that the judgment and decree rendered by this court on the first rehearing be amended by reducing the amount of the award from the sum of $8662.40 to the sum of $6360 and that as thus amended the said judg-

ment and decree are hereby reinstated and made final.

HAMITER and HAWTHORNE, JJ., dissent.

On Second Rehearing

HAMITER, Justice (dissenting).

My conclusion in this case, regarding which I gave written expression in a dissenting opinion on the first rehearing, is that plaintiff should not recover any damages.

I must, therefore, respectfully dissent.

On Second Rehearing

HAWTHORNE, J., dissents, being of the opinion that the plaintiff has not suffered any damages whatsoever. See opinion on original hearing and dissent on rehearing.