REID, Judge.
This lawsuit arises out of certain contracts entered into between plaintiff, Schuylkill Products Company, Inc., and defendant, Alloy Metal Products, Inc., for the sale and purchase of scrap battery lead. Plaintiff alleges that on or about May 21, 1965, it entered into a written agreement with the defendant to purchase 1,000 tons of scrap battery lead for $16.00 per hundredweight for lead and antimony content, less $50.00 per net ton smelting charge, with the shipment to be made to plaintiff’s Baton Rouge plant by July 21, 1965, defendant’s principal place of business being Davenport, Iowa. Plaintiff further alleges that pursuant to the agreement, it tendered and defendant accepted the sum of $50,000 on May 25, 1965, and $40,000 on June 11, 1965, as advances against the invoice charge of defendant; that the defendant refused to deliver the material required under the terms of the agreement and refused to refund the full advance made by plaintiff by withholding the sum of $14,298.67; that plaintiff suffered damages in the amount of $15,452.50 because of the additional cost of obtaining said materials at a later date on the open market, after defendant refused to supply said materials; and further that plaintiff is entitled to legal interest on the $90,000 advanced on the contract price from *324 July 21, 1965, the last performance date under the contract, until October 7, 1965, the date the defendant returned $75,701.33 of the total advance of $90,000, and entitled to legal interest on the $14,298.67 retained by defendant from October 7, 1965, until paid.
The defendant filed a general denial and alleged that the sum withheld from payments made by the plaintiff represented the amount due defendant from various transactions between the parties.
After three days of trial, for oral reasons assigned and read into the record, the Trial Judge rendered judgment in favor of plaintiff and against defendant in the amount of $936.00, being the amount of interest prayed for on the advance of $90,-000, and dismissed the remaining demands of the plaintiff. Application for a new trial was denied and both plaintiff and defendant appealed.
In his oral reasons for judgment, the Trial Judge said there was no dispute as to the fact that two contracts between the parties are involved, the first in the early part of 1965 and the second being the one sued on in the plaintiff’s petition. The first contract, actually three contracts merged into one, was for a total of 1100 tons of scrap material, but slightly less than 1100 tons was actually delivered to plaintiff. Because of a dispute as to the lead content recoverable from the 1100 ton shipment, plaintiff did not remit an amount sufficient to cover that claimed to be due. Prior to the delivery of the 1100 ton shipment, the parties entered into the second contract covering 1000 tons. Again plaintiff advanced certain funds but the second contract was never completed. Plaintiff demanded a return of the money it claimed was advanced on the second contract. Defendant retained $14,298.67 which it said was still due on the first contract and returned the balance of the $90,000 remitted, that is, the sum of $75,-701.33.
The Trial Judge first took up the issue of the retainage by defendant of the $14,-298.67, and stated that it was his opinion that this claim arose because the plaintiff and defendant both were negligent in connection with the agreements covering the first contract for the purchase of 1100 tons of scrap material. He said:
“The real issue is that defendant contends it was guaranteed a seventy-five per cent lead recovery out of this 1100 ton shipment. On the other hand, plaintiff denies any such guarantee and contends its assay shows a lead recovery of approximately .seventy-two per cent. It is not disputed that plaintiff had the right to assay this material upon delivery. That seems to be routine in transactions of this kind, but again defendant contends that despite this right of plaintiff to assay the material it was guaranteed a lead recovery of not less than seventy-five per cent. The court has listened and listened to testimony relative to the assay of this material. It is the defendant’s contention that plaintiff’s assay was incorrect, and it stands on its contention that this sale was made with a guarantee of a lead content of not less than seventy-five percent, this percentage being based on defendant’s experience in this type of business.”
The Trial Judge commented upon the fact that neither party called outside experts to give testimony as to the proper procedures in assaying scrap battery material and admitted that the Court was not in a position to state whether the plaintiff’s assay was made according to recognized procedures nor whether the defendant’s experience in this type of business justified it in requiring a guarantee of 75% lead recovery. The record did show that after the defendant questioned the assay of plaintiff, the President of defendant corporation was invited to come to Baton Rouge to make his own assay or to have an independent expert make such an assay. This he agreed to do only if he could be *325 assured that the material shipped to plaintiff was still intact. He was not given such assurance and the Trial Judge said he was convinced the material was not intact, that some of it had been processed already and other parts of it had been placed in stockpiles on plaintiff’s yard and had been commingled with other materials. The Trial Judge then concluded:
“Coming back to the special terms as shown by plaintiff’s contract forms and by defendant’s contract forms, it has been shown that defendant’s contract forms provided for a payment of fifty per cent of the agreed price upon the placing of the order with an additional thirty per cent to be paid when the buyer was furnished with bills of lading evidencing the shipment of the material, the remaining twenty per cent to be paid after delivery. No such provision was made a part of plaintiff’s contract forms. There were some provisions about payment but they were not the same as that on the defendant’s forms. It is, in the opinion of the court, very significant that in connection with this contract plaintiff made an advance payment of precisely fifty per cent of the sale price of the first two of the 500 ton contracts comprising the large part of the 1100 ton order.
“It is necessary to digress for a moment to say that the record shows, and it seems to be undisputed, that the extra hundred ton order was transmitted to defendant shortly before or possibly while he was in the process of loading the 100 tons in question, and according to the defendant president’s testimony, nothing was done about an advance payment on the 100 tons. Actually it was a little less than 100 tons. The court has stated that this fact is of particular significance in that it clearly indicated to the court that plaintiff understood that defendant had a guarantee of seventy-five per cent lead recovery, and is of material assistance in the court’s reaching a final conclusion in this case in the face of disputes as to what the contract actually was and as to whether the court should be guided by plaintiff’s assay of this material. Let me say that the court’s conclusion that defendant did have a seventy-five per cent guarantee is based on that evidence in the record. Accordingly, it is the court’s opinion that plaintiff is not entitled to recover the item of $14,298.-67.
“As to the claim for damages because of the breach of this second contract the court has listened to the argument of counsel for defendant that there was in fact no breach. Be that as it may this court prefers to rest its conclusions on the time-honored doctrine that the burden of proof is on a plaintiff to establish his claim by a fair preponderance of the evidence, and the court does not believe that plaintiff has done that in this case for this reason: There is in the record considerable testimony dealing with the market, and so on, but there is nothing in the record so far as the court can recall which goes to show that this plaintiff was required by the emergencies in its business to go out and purchase this additional material. It is true that Mr. Erickson testified that they routinely kept a large stockpile of material and that this stock inventory decreased, but I repeat that there is not anything in the record to show that his customers were demanding delivery of his product and he was not able to meet those demands except by these purchases which he testified about in support of this claim for damages. It simply boils down to what I just said, it is the operation of the old doctrine of the burden of proof, and I do not believe plaintiff has discharged it.”
Accordingly, the Trial Judge dismissed all demands of plaintiff except that for interest at the rate of 5% per annum on the advance of $90,000, from July 21, 1965 to October 7, 1965, amounting to $936.00, which he allowed.
In its appeal plaintiff alleges three specifications of error: (1) The Lower Court *326 erred in rejecting plaintiff’s claim for damages for breach of contract for the sale of 1,000 tons of scrap battery lead; (2) The Lower Court erred in finding that Schuylkill Products Company, Inc. guaranteed an assay of seventy-five per cent recovery on scrap battery plates; and (3) The Lower Court abused its discretion in denying plaintiff’s application for a new trial.
Regarding the first allegation of error, that is, that the Lower Court erred in rejecting plaintiff’s claim for damages for breach of the second contract for the sale of 1,000 tons of battery lead, the defendant’s defense is two-fold. First, the defendant takes the position that no second contract ever arose, due to the fact that there was such a serious misunderstanding concerning the terms of the first contract; that obviously there was not a meeting of the minds of the parties, and that the defendant, as soon as it became apparent, advised the plaintiff and refunded to plaintiff that portion of the money advanced which it felt was due the plaintiff. Second, the defendant contends that if a second contract did exist, there were no damages due the plaintiff because no loss or injury was suffered by it. It was this latter contention that was upheld by the District Court Judge, and it is the opinion of this Court, without going into the record in detail, that an examination of the record will disclose that the opinion of the Trial Court in regard to this contention is correct.
The defendant contends that the method employed by plaintiff to set the value of damages is incorrect. In calculating the cost over the contract price in purchasing the 1,000 tons of battery scrap lead, plaintiff selected purchases it had made from outside’ its local market area, which purchases it claimed would not have been made. except for the breach of contract, and it ignored the regular purchases which had normally and routinely been made, that is, rather than taking the cost of the next 1,000 tons it had bought after it had been notified of the breach by the defendant, it continued to buy scrap and took selected items from outside the local area, which purchases it claimed it had to make in order to make up for the contract allegedly violated by the defendant.
Mr. T. Wayne Anthony, Vice President of plaintiff corporation, Schuylkill Products Company, testified on this point as follows:
“We picked out the transactions that we had made where we were trying to recover the one thousand tons of material, and we picked it out of the transactions that we had made that we normally would not make unless we were trying to get more material than we normally would buy in this area. We normally buy approximately all the material in this area, at least we get all we can. The reason for that, it costs less for freight, and the freight charges are paid by the shipper, consequently he has to have a lower smelting charge for his material the further from our plant that he is located, and naturally the closer the scrap is bought the less freight that’s involved and we can get it at a better price for ourselves.”
As pointed out in the case of Pepper v. Katz, La.App., 77 So.2d 891, and in numerous other cases, the correct measure of damages for the breach of a contract of sale of personal property, where no fraud is shown, is the difference between the contract price and the market price of the goods on the date the delivery should have been made.
This same rule of law was cited in the case of Friedman Iron & Supply Co. v. J. B. Beaird Co., 222 La. 627, 63 So.2d 144, where the Court said:
“ * * * This court has on numerous occasions pointed out that the measure of damages for the breach of a contract of sale, where no fraud is shown, is the difference between the contract price and the market price of the goods on the date of the breach.” Emphasis supplied by that Court.
*327 The Court then went on to say:
“ * * * This rule of law is based on solid grounds because neither a plaintiff nor a defendant should be permitted to select the market value of a date different from that on which the contract was breached for the purpose of determining whether any loss was suffered or profit deprived to the detriment of either party.”
It is, therefore, the opinion of this Court that the plaintiff failed to establish by a preponderance of evidence that it suffered any damages because of the breach of contract.
The record also bears out the statement of the Trial Judge that plaintiff had failed to bear the burden of showing that it was required by emergencies in its business to go out and purchase the additional material.
In view of the foregoing, it is not necessary for this Court to go into the question of whether or not a second contract had actually been entered into.
The portion of the Trial Judge’s opinion denying recovery for the alleged breach of contract for the sale of the second 1,000 tons of scrap battery lead is affirmed.
Plaintiff’s second specification of error was that the Lower Court erred in finding that the defendant was guaranteed a 75% lead recovery on scrap battery and, therefore, the defendant was entitled to the $14,298.67 which it had retained from the advances made by plaintiff in connection with the second contract. The defendant had retained this amount from the second advance, contending that it was entitled to this amount because of the failure of the plaintiff to pay the amount due under the first contract. Plaintiff’s brief indicates that the Trial Judge based his reason for granting the retention of the $14,298.67 on the testimony of Mr. Arant Sherman, President of the defendant corporation, relative to his understanding with Mr. Stribling Berteau, an employee of Schuylkill who, according to Mr. Sherman, had orally guaranteed a minimum assay of 75%. Mr. Berteau was deceased at the time of the trial. An examination of the Trial Judge’s oral reasons for judgment does not bear out plaintiff’s contention as nowhere does he mention the testimony of Mr. Sherman.
The Trial Judge based his reasons solely upon the following assumptions: The form of contract used by the defendant provided for a payment of 50% of the agreed price upon placing the order, 30% upon receipt of the invoice, and the remaining 20% after delivery, and that it was “very significant that in connection with this contract plaintiff made an advance payment of precisely fifty per cent of the sale price of the first two of the 500 ton contracts comprising the large part of the 1100 ton order” assuming a 75% assay at a price of $16.00 per hundredweight less the smelting charges called for in the contract.
The plaintiff argues in opposition to the finding of the Trial Judge that (1) the contract did not provide for a guaranteed minimum assay, and (2) the defendant, in retaining this money from the second advance, was actually claiming compensation and since the defendant had failed to specifically plead compensation, as required under Article 1005 of the Louisana Code of Practice and under the jurisprudence, it was not entitled to raise that issue. Counsel for plaintiff points out in his brief that in a plea of compensation the burden of proof is on the defendant and cites the case of Ben C. Penn & Son v. Thompson Packers, Inc., La.App., 169 So.2d 259, and, therefore, even if defendant had properly pled compensation, which plaintiff denied, in order for defendant to recover it must prove by a preponderance of the evidence that it was underpaid by $14,298.67 for a previous shipment of scrap battery lead, which the defendant could do only by proving a guaranteed assay. Defendant’s brief admits it did not plead compensation but contends that its defense was simply a denial of what plaintiff claims the terms *328 of the contract were, and that even if a plea of compensation was needed, the pleadings in this case were enlarged by allowing evidence to be introduced on this point, without objection (LSA-C.C.P. Art. 1154). Defendant also points out that this issue had been raised in a deposition prior to the trial.
It is the 75% guarantee that forms the crux of plaintiff’s second allegation of error by the Trial Court.
The evidence in this case is clear that both parties were apparently quite careless in their negotiations. This fact was also pointed out by the Trial Judge. Each party sent the other party its contract and each contract contained different terms. The contracts introduced by the plaintiff provided for 80% of the estimated price as an advance against invoice and shipping documents. The contracts introduced, by the defendant show that only one was signed or accepted by the plaintiff. That was the contract for the additional 100 tons. Defendant’s contract form calls for 50% advance payment with the order, 30% upon receipt of the invoice and the balance on final settlement. Each party argued strenuously that its contract was the one in force. As the Trial Judge pointed out, it is apparent that the plaintiff operated under the defendant’s contract to some extent for it made an initial advance of approximately 50% of the amount of the contract.
Actually, insofar as the issues at hand are concerned, the fact of which contract the parties operated under is not important, unless the defendant is correct in contending that the contract intended there was to be a 75% minimum assay.
It is conceded by all parties, and the evidence is clear that ordinarily in the purchase and sale of scrap battery lead it is customary for the purchaser to assay the lead content of the material and then pay the seller a sum based on the percentage of lead recovery as the agreed price between the parties for the lead less the agreed smelting charge. We have as a first point, therefore, that in the ordinary course of business of both parties there is no such thing as a guaranteed minimum assay. The defendant urges, however, that this was not a usual or customary sale and Mr. Sherman testified that since there had been difficulty with the plaintiff company in the past he wanted to be protected in this sale and had insisted upon a minimum assay.
The next point is that an examination of the contract of defendant shows that while it does provide for certain contingencies, it does not provide for a minimum assay. Furthermore, while Defendant’s contract marked Exhibit D-5 provides for 50% payment on receipt of the order, 30% on receipt of the invoice, and the balance on the final settlement, the contracts introduced as D-4 for 100 tons and D-6 for the second 1000 tons, only mentioned the 50% advance with the order and did not provide for any set payment upon receipt of the invoice or any other terms of payment. This makes it clear that the contracts themselves do not provide for a guaranteed assay and, therefore, any proof of this point would have to be made outside of the terms of the contract.
Throughout the defendant’s brief counsel talks about the price being $16.00 per hundredweight for lead and antimony content less $45.00 per net ton smelting charge. However, the first contract provides for “E & M. J. average for next 90 days for New York common lead, for lead and antimony content less a $45.00 per net ton smelting charge.” This is the same language used in plaintiff’s contract for the first 500 tons. Therefore, it is not clear from these contracts that $16.00 per hundredweight was to be the set price for the first contract for 500 tons. They show instead that the price was to be averaged over a 90 day period and, therefore, a 50% payment could only be an estimate and would not indicate in themselves a guaranteed assay. The record also clearly shows that the second payment made by the plaintiff, upon receipt of the invoices, was $60,000, which would be $30,000 for each contract. *329 Using plaintiff’s own figures, this would not be 30% but would be 331/$%, again indicating that there was no implied guarantee based on the schedule of payments. There is also the language on defendant’s contract marked D-5 and on its invoices marked D-15, D-16 and D-17, which provides that the balance is to be paid on final settlement. If there is a guaranteed assay at a certain price, why would they have to make reference to a final settlement rather than to 20% of a set figure upon full delivery ? Certainly the language of the contract implies that there is some settlement to be made at a later time on a factor not certain at the time of the preparation of the contract, and since it is customary in the industry for the final settlement to be based on the amount of material to be assayed, this would lend great weight to plaintiff’s contention that there is no guaranteed assay. Defendant points out that on the second contract the plaintiff again paid 50% of the contract on the same basis. The smelting charge was $5.00 different and, therefore, 50% could not have been the same on the two contracts.
While defendant maintains that 50% of the contract advanced on the price and figures set forth, based on 75% assay, would show a minimum guarantee, the plaintiff’s brief, using the defendant’s figures, cites figures to show that had a guaranteed 75% assay been anticipated, the advance on the first contract would have been $48,750 and on the second would have been $47,500. Plaintiff also shows that to obtain a $90,000 figure, based on the defendant’s own figures, the metal content on the first contract would have had to be 70.31% and on the second contract 71.87%. It seems clear from the evidence that the figures do not help the defendant’s case.
Further objection to the defendant’s reasoning, as pointed out in plaintiff’s brief, is based on the deposition of defendant’s President, Mr. Sherman, who testified on July 19, 1966, as follows:
“Q. Do yoit ever ship under a guaranteed lead content contract?
A. No, we have sold material at a flat price.
Q. What do you mead by a ‘flat price’ ?
A. Just so much per pound of materials.”
At the time of the trial, however, Mr. Sherman testified that his company does have a guaranteed minimum contract. His explanation of this change in testimony was “Well, I assumed that you were talking about other consumers.”
Plaintiff also points out that when questioned by his own attorney, Mr. Saul Gordon, Vice President of the defendant company, was not asked whether or not he negotiated the contracts for a guaranteed minimum assay, even though the record is clear that Mr. Gordon was the man who did negotiate the contracts. This fact would give rise to the presumption, as set forth by plaintiff, that any testimony on this point by Mr. Gordon would have been unfavorable for the defendant.
While the defendant argues that its invoices to the plaintiff on delivery of material supported its claim of a guaranteed assay of 75%, plaintiff points out that payment was not based on the invoices because the invoice marked D-16 shows a 73% recovery for battery plates, and D-17 shows a 60% recovery. Defendant’s President testified that this was in error.
Considering all of the above facts, together with the fact that a guaranteed minimum assay was not normal and customary in this business, and the complete lack of any positive evidence on the part of the defendant to substantiate its position, it is clear that regardless of whether or not the defendant did plead compensation by its introduction of evidence without any objection by plaintiff, the defendant has not borne the burden of proof to a degree which would substantiate a plea of compensation, the record being entirely devoid of any probative testimony which would show that there was a guaranteed assay.
*330 We realize that it is a well settled rule that the finding of fact by the Trial Judge will not be reversed unless manifestly erroneous, but it is the opinion of this Court that there is no evidence whatsoever to show that it was the intent of the parties that the price involved in the contracts at issue should be determined by a guaranteed assay.
In view of this finding, it is not necessary for this Court to go into the third allegation of error, that is, the refusal of the Trial Court to grant a new trial.
Regarding the award of interest by the Trial Judge, we find no error.
Accordingly, the judgment of the trial court allowing the retention by defendant of $14,298.67 is reversed, and judgment is rendered in favor of plaintiff, Schuylkill Products Company, Inc., and against the defendant, Alloy Metal Products, Inc., in the sum of $14,298.67, with legal interest thereon from judicial demand until paid. In all other respects the judgment of the Trial Court is affirmed, cost of this appeal to be borne by the defendant.
Reversed in part, affirmed in part, and rendered.