337 So.2d 676 (1976)
James Michael FORET, Plaintiff-Appellee,
v.
AETNA LIFE AND CASUALTY CO., Defendant-Appellant.
No. 5646.
Court of Appeal of Louisiana, Third Circuit.
September 22, 1976.
*677 B. J. Manuel, Mamou, for plaintiff-appellee.
Fusilier, Pucheu & Soileau, by J. Wendel Fusilier, Ville Platte, for defendant-appellant.
Before CULPEPPER, DOMENGEAUX and GUIDRY, JJ.
GUIDRY, Judge.
This is a suit for disability benefits under a group insurance policy issued to Reading & Bates Offshore Drilling Company (hereinafter referred to as "Reading & Bates") by the defendant Aetna Life & Casualty Company (hereinafter referred to as "Aetna"). Plaintiff, an insured employee of Reading & Bates, ruptured his spleen on October 16, 1971 when he fell into the water from an offshore drilling platform. The trial court awarded plaintiff disability benefits in the principal amount of $453.44 per month from the date of the accident to the date of its formal judgment, which judgment was signed on April 13, 1976, and thereafter for the period of disability. Plaintiff's claim for penalties and attorney's fees was denied. Defendant appealed. Plaintiff neither appealed nor answered the defendant's appeal.
*678 We note from our review of the record that Mr. Donald Soileau on December 19, 1973, following the trial of this matter, filed a motion to withdraw as the plaintiff's attorney of record. The trial court granted the motion and Mr. Soileau subsequently filed a petition for intervention on January 17, 1974, claiming a percentage interest in any recovery obtained by the plaintiff in this action. In addition, Mr. Soileau prayed for all costs and disbursements made by him in regards to plaintiff's case. Attached to the petition for intervention was the contingency fee agreement executed between the plaintiff and the intervenor. An answer to Mr. Soileau's petition was filed by the plaintiff on June 14, 1974, after which the intervenor moved for summary judgment. The trial court set a hearing on the motion for July 3, 1974. No further disposition of this matter appears in the record. We presume that the trial court, pursuant to the authority contained in LSA C.C.P. Art. 1038, proposes to separately try this incidental action, however there is no order to that effect in the record. In any event, this incidental matter not having been disposed of by the trial court is not before us on this appeal.
The instant matter raises no issue regarding the fact that the plaintiff's accident of October 16, 1971 occurred during the course and scope of his employment with Reading & Bates. The defendant insurer stipulated at the time of trial that the plaintiff had an accident that would be covered under its policy. However, although conceding the occurrence of the accident, defendant contends that the plaintiff's resulting injuries do not constitute "total disability" within the meaning of its disability policy provisions and therefore the claim for benefits should be denied.
This matter was tried on November 5, 1973, it being agreed at that time that the record would be left open in order that the deposition of Dr. John Church be taken and introduced as additional evidence. Subsequent to the taking of Dr. Church's deposition on February 27, 1974, the plaintiff filed a motion requesting that the case be reopened to allow the deposing of Drs. John Patton and Frank P. Savoy, Jr. Dr. Savoy had previously testified at the trial. On October 30, 1975 the trial court granted the plaintiff's motion and the depositions of these doctors were taken. Subsequent thereto the trial court took the matter under advisement and then rendered a decision in April of 1976.
Plaintiff was originally admitted to Our Lady of the Sea Hospital in Morgan City following his offshore accident. He was later transferred to Savoy Memorial Hospital in Mamou, Louisiana, on October 22, 1971 where X-rays were taken and he was examined by Dr. LaHaye relative to his complaints of pain around the left posterior lateral of the chest and the upper abdomen. Dr. LaHaye's examination revealed that the plaintiff was suffering from a ruptured spleen. Shortly following this diagnosis plaintiff's spleen was surgically removed by Dr. Frank P. Savoy. Following the splenectomy, Dr. LaHaye attended the plaintiff during his one month stay in the hospital.
Since his discharge from the hospital in late 1971 plaintiff has consistently maintained that he is unable to perform the duties of his former occupation or work of any reasonable character because of constant pain in the abdominal area. On the other hand defendant maintains that plaintiff is now and has been fully capable of returning to his former occupation since his discharge by Dr. Savoy on June 23, 1972.
During the period following his discharge from the hospital to the time of trial plaintiff continued to see his treating physicians, Drs. LaHaye and Savoy, as well as several other physicians. All of these doctors testified either at trial or by deposition. We briefly summarize the medical evidence in the record.

DR. LaHAYE
In October of 1972 Dr. LaHaye had occasion to re-examine the plaintiff finding at this time that he had recovered from the operation. The physician suggested that some type of physical work would not be disabling, although he still considered the *679 plaintiff at the time of this examination to be totally incapacitated to perform work as a roughneck or roustabout. Dr. LaHaye next examined plaintiff on October 18, 1973. On the occasion of this examination plaintiff had complaints of pain in the upper left abdomen overlying the previous incision through which the splenectomy had been performed. Dr. LaHaye could not give a definitive diagnosis but he noted the weakness of the incision and felt that there was a possibility of an incisional hernia. According to Dr. LaHaye an incisional hernia develops after an operation and may be due to a complication of the operation or because of difficulty in healing following surgery. Being unaware of any post-operative difficulties Dr. LaHaye felt that if the plaintiff was suffering from an incisional hernia it must have developed following his October 1972 examination. The doctor admitted that it could have been possible for him to have overlooked the hernia at the earlier examination. Dr. LaHaye stated that the plaintiff's incisional hernia could be corrected by surgery. Dr. LaHaye was of the opinion at the time of trial, i.e., November 5, 1973, that plaintiff was unable to perform work as a roughneck or roustabout.

DR. SAVOY
Dr. Savoy's testimony at the trial of November 5, 1973 and by deposition on October 30, 1975 shows that he first examined the plaintiff on October 26, 1971. After this initial examination the doctor diagnosed that the plaintiff had sustained a subcapsular hemorrhage of his spleen, which caused the spleen to rupture. Dr. Savoy performed a splenectomy on the plaintiff. Plaintiff remained in the hospital for one month. Dr. Savoy again saw plaintiff in February of 1972 because of plaintiff's complaints of pain in the incisional area. This examination revealed no objective signs of defect in the incision. Plaintiff thereafter remained under Dr. Savoy's care until June 23, 1972 on which latter date Dr. Savoy discharged plaintiff to return to work, having found after another examination no objective signs of defect in the incision. In spite of his discharge plaintiff still complained of soreness in the incisional area. Dr. Savoy stated in his October 1975 deposition that the plaintiff was probably developing an incisional hernia at the time of the June 23, 1972 examination, but that he was unable to detect it. In October of 1974 and again in October of 1975 Dr. Savoy re-examined the plaintiff. The doctor testified that these examinations revealed the presence of a defect in the incision approximately the size of a silver dollar an inch below the zyphoid process and another small defect just above the umbilicus in the incision. After the October, 1975 examination Dr. Savoy found that the plaintiff had developed an incisional hernia. He further concluded that the pain plaintiff was experiencing was additionally referable to the stainless steel sutures which X-rays showed to be fragmented. The two examinations were consistent except that the defect in the incision appeared to be worse in October of 1975. Dr. Savoy stated in his October 1975 deposition that the plaintiff was not in a position to return to work as a roughneck, but agreed with Dr. LaHaye that the incisional hernia could be corrected with a successful operation followed by 90 days of convalescence.

DR. JOSEPH PATTON
Dr. Joseph Patton examined the plaintiff on August 27, 1974. Dr. Patton's report shows that the plaintiff had complaints of pain in the abdominal area. Positive physical findings by the doctor revealed that the plaintiff had a well-healed upper left rectus or upper abdominal scar. Another incision over the region of the umbilicus was well healed, the plaintiff relating that during October of 1973 he had undergone repair of an umbilical hernia at the Veteran's Hospital in Alexandria. Dr. Patton stated that the umbilical hernia is a congenital hernia and is usually present from birth. He further stated that it was unlikely that trauma caused this umbilical hernia, although it is possible that trauma enlarged it. Not having seen the defect in the umbilical hernia at the time of surgery Dr. Patton was unable *680 to definitely establish any connection between the plaintiff's splenectomy and this congenital hernia although he said it was possible that plaintiff developed the herniation from the splenectomy. X-rays reviewed by Dr. Patton showed that the stainless steel sutures used in the splenectomy were broken into fragments, evidencing that the incision was weak and no longer intact. Dr. Patton concluded that plaintiff was experiencing pain in the incisional area from the broken ends of the stainless steel sutures. In regards to the removal of the fragmented sutures the surgeon was of the opinion that this was a difficult operation and one he would not recommend. Dr. Patton saw the plaintiff again on August 12, 1975 his testimony indicating that the plaintiff did not have an incisional hernia at this time. Concerning his ability to return to work as a roughneck the doctor felt that it would be painful and that the plaintiff would very likely develop an incisional hernia. Dr. Patton suggested that the plaintiff seek lighter duties.

DR. JOHN CHURCH
Dr. John Church of the Veteran's Hospital in Alexandria testified by way of deposition regarding his examination of the plaintiff in the fall of 1973. His report was brief having only seen the plaintiff on his initial visit to the hospital. Dr. Church did not find any evidence of an incisional hernia and felt that the plaintiff was able to work. Plaintiff was directed to return for a follow-up evaluation, however Dr. Church stated he did not see the plaintiff on his return and no report of this second visit appears in the record. Except for the physical findings by Dr. Patton and the testimony of the plaintiff there is no evidence in the record regarding the plaintiff's umbilical hernia operation at the Veteran's Hospital which occurred in late 1973.
The lay evidence in the record shows that the plaintiff, who at the time of his accident was 23 years old, had an 11th grade education. He has had no special training and has only worked at manual labor of one type or another. The plaintiff's job duties with Reading & Bates consisted of the type of general oilfield work performed by a roughneck and/or roustabout. Plaintiff estimated his salary with Reading & Bates to be about $700.00 per month. Plaintiff worked 12 hour shifts, 7 days on and 7 days off. Plaintiff occasionally worked overtime. Plaintiff thought his hourly wage rate to be about $3.51.
Plaintiff testified that due to the pain in his stomach he has been unable to work since the date of his accident. He admitted that he has worked part time in a grocery store pricing and stacking food items and stated that he received food in payment for his services. Mrs. Foret, the plaintiff's wife, corroborated her husband's testimony. The defendant called no witnesses.
The trial court after reviewing all of the medical testimony, but without further specification, found the plaintiff to be totally and permanently disabled within the terms of the policy issued by the defendant, Aetna, and awarded plaintiff disability benefits for the period from October 16, 1971 to the date of formal judgment and thereafter for so long as his disability persisted within the terms of the policy.
We pretermit a discussion of the plaintiff's claim of "total disability" at this point to consider the decision of the trial court in awarding disability benefits to the plaintiff from the date of the accident, i. e., October 16, 1971.
The Aetna policy which was introduced into evidence as Defendant's Exhibit "1" sets forth in Article II Section 2 that:
"The Insurance Company shall, subject to the terms of this policy pay a monthly benefit during the continuance of the period of disability while the employee is "totally disabled" as defined in Section 1 of this Article II, commencing with the first day following the completion of the qualifying period." (Emphasis ours)
Article II Section 1(e) defines "Qualifying Period" as follows:
"as to any one period of total disability of an employee, the first six months of such period of total disability. Only one qualifying *681 period is required with respect to those periods of total disability which are considered as one period of total disability under Section 2 of this Article II."
Clearly under the provisions of the policy any award of disability benefits that may be due the plaintiff would first require his qualification by the passage of one six month period of total disability. Consequently any payments to plaintiff would commence on April 16, 1972 six months after the date of the accident.
We now turn to a consideration of the principal issue, i. e., is plaintiff totally disabled within the meaning of the policy issued by the defendant to plaintiff's employer? The policy provisions pertinent to this issue read as follows:
Article IISection 1(f):
"`Reasonable occupation' means any gainful activity for which the employee is, or may reasonably become, fitted by education, training, or experience, but shall not mean any such activity if it is in connection with an approved rehabilitation program."
Article IISection 1(g):
"`Total disability' or `totally disabled' means, during the first twenty-four months of any one period of disability, that the employee is unable, solely because of disease or accidental bodily injury, to work at his own occupation; and, thereafter during the continuance of such period of disability, that the employee is unable, solely because of disease or accidental bodily injury, to work at any reasonable occupation."
We first observe that the policy definition of total disability differs depending upon the period of disability. That is to say, during the first twenty-four months "total disability" means that the employee is unable solely because of disease or accidental bodily injury to work at his own occupation. Following such period, however, "total disability" arises or continues only in the event it is established that the employee, solely because of disease or accidental bodily injury, is unable to work at any reasonable occupation.
As aforestated the trial judge found the plaintiff "totally disabled" since the date of accident. In reaching this conclusion the trial judge did not, in his written reasons, allude to the different definitions of "total disability" as set forth in the policy. This is to say, the trial judge did not distinguish his finding of disability based upon the plaintiff's ability to perform at his own occupation for the first twenty-four months and thereafter according to the standard of a "reasonable occupation." Be this as it may we find no manifest error in the conclusion of the trial court that defendant has shown his "total disability" within the meaning of the policy for the first twentyfour months, as well as his "total disability" for an indeterminate period following such initial period, within the meaning of the policy provisions as such provisions have been construed by our courts.
There is no evidence in the record which would suggest that plaintiff's continued pain and weakness in the abdominal area is caused by any circumstance other than plaintiff's initial injury and the corrective surgery performed in October of 1971. Further we believe that the medical and lay testimony in the record reasonably supports the conclusion that such condition (pain and weakness in the abdominal area which finally developed into an incisional hernia and fragmented sutures) began shortly following plaintiff's discharge from the hospital in November 1971; persisted through the date of trial; and, prevents plaintiff from performing the work of a roughneck or roustabout.
Dr. LaHaye who originally examined the plaintiff and attended him during his stay in the hospital and who thereafter saw the plaintiff in October of 1972 and 1973, continually maintained that the plaintiff was able to do some physical work, but he was not able to return to work as a roughneck. Dr. Savoy, the surgeon who performed the splenectomy and later discharged plaintiff to return to work in the oilfield on June 23, 1972 indicated in his testimony that his *682 earlier conclusion that plaintiff was able to work was probably incorrect. Dr. Savoy stated that there was a good chance that the plaintiff was developing an incisional hernia on June 23, 1972. Dr. Savoy likewise found the plaintiff unsuitable for work as a roughneck as late as October 30, 1975.
The only other doctor who examined plaintiff during the first twenty-four month period was Dr. Church. Dr. Church found that plaintiff did not have an incisional hernia and was able to work. These findings were made as the result of one brief examination in the fall of 1973. The testimony of Dr. Church must be considered however, in light of the testimony of Drs. LaHaye and Savoy, plaintiff's treating physicians, and particularly the latter who candidly testified as to the probability of his own earlier diagnosis being incorret in view of the later positive diagnosis of an incisional hernia in October of 1975.
We next consider whether the plaintiff has exhibited his "total disability" within the policy provisions for any period beyond the initial twenty-four months.
The policy provides benefits beyond the initial twenty-four months upon a showing of inability to perform work at any reasonable occupation. Reasonable occupation is defined as any gainful activity for which the employee is, or may reasonably become, fitted by education, training, or experience.
Our courts have adopted a policy of liberal interpretation respecting accident insurance policies which provide benefits for total permanent disability, or the inability to engage in any occupation for compensation or profit. Crowe v. Equitable Life Assur. Soc. of United States, 179 La. 444, 154 So. 52 (La.1954). Policy provisions similar to those above referred to have consistently been construed to mean the insured will be denied benefits only when he can perform substantial and material duties of his occupation in the usual and customary manner. That the insured may engage in some other occupation does not disqualify him insofar as concerns policies of this character. Ayres v. New York Life Ins. Co., 219 La. 945, 54 So.2d 409 (1951); Patterson v. Metropolitan Life Ins. Co., 194 La. 106, 193 So. 478 (1940); Felker v. Aetna Life Ins. Co., 234 So.2d 758 (La.App.), writ refused 256 La. 377, 236 So.2d 503 (1970); McNeill v. Continental Casualty Company, 244 So.2d 693 (La.App. 4th Cir., 1971); Dupre v. Hartford Life Insurance Company, 291 So.2d 824 (La.App. 3rd Cir., 1974); Benoit v. Travelers Insurance Co., 251 So.2d 87 (La.App. 3rd Cir., 1971).
The plaintiff, who has only an 11th grade education with no special training or skills, is not fitted by training or experience for any type work except manual labor. As aforestated we find no manifest error in the trial court's conclusion that by reason of plaintiff's physical condition he has been, since October 16, 1971, unable to perform heavy manual labor such as that required by a roughneck or roustabout. Under these circumstances, when the policy provisions in question are construed in light of the jurisprudence we have no hesitancy in concluding that plaintiff has established his "total disability" within the meaning of the policy for an indeterminate period beyond the initial twenty-four month period.
We finally consider the correctness of the monetary amount of the monthly disability payments awarded by the trial court to the plaintiff.
Under the defendant's policy plaintiff is entitled to recover a monthly disability benefit equal to 60% of his "monthly rate of basic earnings". The term "monthly rate of basic earnings" is defined in the policy as follows:
Article II Section 1-b(i-a):
"The employee's monthly rate of earnings in effect for the last complete payroll period immediately preceding the commencement of the period of total disability, exclusive of bonuses, overtime pay, and other extra compensation."
Our examination of the record reveals an almost total lack of competent evidence establishing this most important fact. The plaintiff testified that his monthly income was approximately $700.00. He stated that he thought his hourly wage rate was $3.51. *683 The plaintiff's testimony as to his income is not documented or otherwise corroborated.
The defendant introduced in evidence, without objection from the plaintiff, a schedule purporting to represent plaintiff's compensation breakdown. (Defendant's Exhibit "2"). It is obvious from an examination of this exhibit that it is not an official payroll record of Reading & Bates. There is no indication that the information set forth on this exhibit was even obtained from Reading & Bates. Admittedly some type of earnings information is set forth on the exhibit, but these figures are meaningless. The figures do not specifically indicate the payroll period covered by the payments nor do they show the plaintiff's basic rate of pay. Further, there is nothing in the exhibit to indicate if the figures are net or gross earnings. The defendant introduced no testimony to either clarify or explain his exhibit. The plaintiff's testimony and the defendant's exhibit as discussed hereinabove is the only evidence in the record bearing upon the plaintiff's monthly rate of basic earnings.
In his written reasons for judgment the trial judge determined that the plaintiff's monthly rate of basic earnings amounted to the sum of $755.73. The trial court obviously made this determination from the figures set forth on Defendant's exhibit 2. For the reasons previously given we do not consider this exhibit to be sufficient upon which to base a finding of plaintiff's "monthly rate of basic earnings". In any event, we note that the trial court apparently erred in calculating from this exhibit the plaintiff's monthly earnings for the last complete payroll period prior to October 16, 1971. The figure, i. e., $755.73 purports to include the "straight time" earnings paid to plaintiff on September 18, October 2, and October 16, 1971, a period of presumably six weeks not one month. Additionally, the trial court erroneously awarded plaintiff a monthly sum in excess of that prayed for. The trial judge awarded the plaintiff 60% of what he determined to be the plaintiff's monthly income, i. e., $755.73, or $453.44 in monthly disability benefits. The trial court apparently overlooked the allegation in plaintiff's petition which stated his monthly income to be $700.00, and plaintiff's prayer which seeks a monthly disability payment in the amount of $420.00 (60% of $700.00). We think the rule restricting recovery to the amount prayed for is applicable here. In Friedman Iron & Supply Co. v. Beaird Co., Inc., 222 La. 627, 63 So.2d 144 (S.Ct.1953) the court stated:
"Taking up these points in the order just presented, regarding the first it is hardly necessary to have to state that a plaintiff cannot recover a greater amount than what he prays for. That is elementary
. . .
Neither is there any merit to the contention that the pleadings have been enlarged by the admission of unobjected to testimony. The rule on this point, as stated in City of Shreveport v. Chatwin, 139 La. 531, 71 So. 791, 792, is that `evidence received without objection enlarges pleadings only when it would not have been admissable if objected to . . ."
Since in our opinion the record is inadequate due to a paucity of competent evidence on this most important point we conclude that remand for the introduction of additional evidence to establish the disability benefit to which plaintiff is entitled is in the interest of justice. LSA-C.C.P. Article 2164; Salley Grocer Co. v. Hartford Accident & Indem. Co., 223 So.2d 5 (La.App. 2nd Cir. 1971) writ refused 254 La. 134, 222 So.2d 883 (1969); Missouri Pacific R. Co. v. Louisiana Public Service Commission, 241 La. 242, 128 So.2d 644 (1961).
Upon remand the plaintiff and defendant may introduce all evidence bearing upon the calculation of the plaintiff's monthly disability benefit, including any evidence relating to "other income benefits", which are deductible from plaintiff's monthly benefit, as defined in the policy. (Article II Section 2, (D)other income benefits).
For the foregoing reasons the judgment appealed from is affirmed insofar as it determines that the plaintiff is "totally disabled" *684 within the provisions of the policy. Insofar as the judgment decrees that plaintiff is due disability benefits from the date of his accident on October 16, 1971 said judgment is amended to order and decree that the plaintiff's disability benefits are due from April 16, 1972 through his period of disability. Insofar as the judgment appealed from awards a money judgment against the defendant and in favor of the plaintiff the judgment is set aside and annulled and this matter is remanded for a redetermination of the monthly disability benefits to which plaintiff is entitled under the provisions of defendant's policy, all consistent with the views hereinabove set forth. All costs of this appeal to be borne by defendant.
AMENDED AND AFFIRMED IN PART; SET ASIDE AND REMANDED IN PART.