CHEHARDY, Judge.
Plaintiff-appellant, Roger T. Boes, appeals a trial court judgment dismissing his suit in contract for specific performance or, in the alternative, for damages, against defendant-appellee, New Orleans Public Service Inc. (NOPSI).
Boes was employed by NOPSI for almost 26 years, and he held his final position, that of storekeeper, at the Carrollton storeroom for a year and a half before his termination on November 9, 1977.
In May of 1977 at a meeting of supervisory and management personnel, Boes learned of the existence of an employee benefit entitled a “Disability Program,” which stated in pertinent part:
“In order to qualify for disability benefits under the Company’s Disability Program, an employee must comply with all of the following:
1. Must have completed 20 or more years of continuous service with the Company.
2. Must present his medical records including a certification by his own physician that he is totally and permanently disabled to the extent that he is unable to perform the duties of his job or engage in any other gainful work for which he is suited or for which he might become qualified, considering his age, physical condition, education, training, and work experience.
3. Must be certified by the Company’s physicians on the same basis.
*590 4. Must qualify for and collect disability payments from the Social Security Administration under their disability retirement program, subject to the exception stated below.”
The program also described certain exceptions that could be made by the company regarding employees who might not be approved by the Social Security Administration but who otherwise qualify for the program, and company requirements that an employee found eligible for disability benefits submit to further physical examinations from time to time with failure by an employee to do so resulting in disqualification for company benefits. Additionally, if, in the course of these examinations, an employee is found to be sufficiently recovered as to' be no longer considered totally disabled, his payments and benefits under the company program may be suspended.
The program also distinguishes itself from the company’s Retirement Income Plan, where employees’ rights are described as “vested.”
Plaintiff has a history of back problems dating from 1961 with surgery for removal of a disc in 1964. Plaintiff testified his back problems worsened in October of 1977; accordingly, he consulted Dr. Walter H. Brent, Jr., an orthopedic surgeon, who had taken care of these back problems since their inception. As a result of an examination of Boes and considering the requirements of the job as given to him by Boes, Dr. Brent wrote a letter stating in part:
“He has a degenerative arthritic condition of the spine with a marked sciatica on the right with loss of sensation to pin prick, marked limitations of motions in the varied directions and increased pain with activity. He has now reached the point where he can no longer tolerate the discomfort following heavy activity.
“I have advised Mr. Boes that he should no longer do any activity which requires heavy lifting, squatting or climbing or long periods of standing. It is my understanding that this is required in Mr. Boes’ occupation and I have therefore advised him that he can no longer continue with this type of work.”
This letter was presented by the plaintiff to Dr. Charles W. Peterson, who is retained by NOPSI to provide medical and consultant work for their employees. Dr. Peterson made arrangements for the plaintiff to be examined by Dr. Harold M. Stokes, an orthopedic surgeon, who was also supplied with a job description of Boes’ position of storekeeper prepared specifically for this purpose by NOPSI’s Personnel Department. This written description stated in part:
“A. PURPOSE OF JOB:
Be responsible for and act as custodian of the supplies at the Carrollton Shops Storeroom. To provide a ready stock at a minimum investment to meet the operating needs of the Transit Maintenance Division at the Carrollton Shop.
B. PRINCIPAL DUTIES:
1. Maintain a continuous inventory of material and supplies.
2. Determine quantity of material to be ordered and initiate purchase requisitions.
3. Receive material, check quantity, quality and condition, store, and prepare material receipts for same.
4. Issue material and stationery supplies to using departments.
5. Perform all clerical functions associated with stock control.
* * * * $ *
D. EFFORT (MENTAL & PHYSICAL):
Concentrated mental effort is essential most of the time in order to secure maximum accuracy in the operation. Some routine work requires little concentrated mental effort.
Job requires average walking and standing. Moderate physical effort is exerted on occasion and usually for a short period of time. (Of the various Stores Department facilities, this is considered a ‘slow activity’ storeroom.)
******
*591 NOTE: When material is received on pallets requiring the use of a forklift truck, the Transit Maintenance Division uses their equipment and assists in unloading these pallets from the delivery truck. They position the pallets in the receiving area of the storeroom. From this point, heavy individual components are moved by the use of a two-wheel hand truck. The material storage shelves range from floor level to a height of 10 ft. and are reached by a ‘shoe store’ type ladder. (Heavier items are generally stored at lower levels and lighter material on the upper shelves.)
The heavier items handled at this storeroom by Stores Department personnel range from 35-100 lbs. (Examples: pail of grease — 35 lbs.; box of welding rods — 50 lbs.; bag of Oil-Dri — 50 lbs.; case of paper towels — 70 lbs.; roll of rubber flooring — 100 lbs.) In the Oil Room, 55 gallon drums of oil (550 lbs.) are moved by the use of an overhead chain hoist on track, but certain movement for proper positioning is done with a drum dolly.
It should be noted that items such as streetcar wheels, axles, brake shoes, and other such heavy items are handled by members of the Transit Maintenance Division and not Stores Department personnel.”
Dr. Stokes examined the plaintiff on October 31, 1977. A written report of his findings, dated November 11, 1977, was sent to Dr. Peterson and stated in part:
“ * * * This 44 year old male complains of neck, mid and low back pain, which he states is related to degenerative arthritis of his back and he does not believe that he can be doing the work of a freight handler.
“The patient has missed no work in the past year because of his neck or back pain. He takes Valium and Inderal and, as I have talked with him, I also find that he has on rare occasions taken Motrin. “I have had the opportunity to review job descriptions for the patient’s position. The first job description is that of a storekeeper at the Carrollton Shops’ storeroom. Apparently the second description would represent a re-assignment position for the patient if necessary.
“Basically, this patient does have degenerative disease of the cervical, dorsal and lumbar spines although they do not appear to be severe. Mechanically, he demonstrates full range of motion of his neck and back and there are no findings consistent with nerve root compression or irritation.
“I believe that if this patient has been successfully carrying out his work up to this point I see no reason why he cannot continue in either position, as described.”
On November 9, 1977, Boes met with Charles G. Reddell, manager of General Properties and Services for NOPSI, and Robert J. Armbruster, Reddell’s assistant. This meeting resulted in plaintiff’s termination on that same day. A memo written by Armbruster describing the meeting between the three states in part:
“The subject employee has been off continuously due to a pain in his neck and arm since Tuesday, September 6, 1977 to date.
“He was informed yesterday evening, Tuesday, November 8, to report to the Company doctor’s office on Wednesday, November 9, at 10 a. m.
“Following his visit with Dr. Peterson, he returned to Mr. C. G. Reddell’s office, and in the presence of Mr. Reddell and Mr. R. J. Armbruster, Mr. Boes stated that Dr. Peterson had told him the outside specialist he was sent to by the Company had reported back to Dr. Peterson that he was fully capable of performing the job assigned. Mr. Boes informed Mr. Reddell that he told Dr. Peterson he felt that he was unable to return as requested.
“During the course of the conversation in Mr. Reddell’s office, Mr. Boes stated on a number of occasions that he felt he could not perform the duties assigned. He also said he has been to the Social Security office about his disability but has not seen their doctor as yet.
*592 “When told by Mr. Reddell that we had even given consideration to transferring him to the Stationery Storeroom as Storekeeper, with the full understanding that he will not pick up anything of any consequence but would be instructed to call for assistance from the other Stores personnel assigned to that area or from the Building Department personnel, this employee stated he felt he could not perform in this area.
“Upon return to Mr. Reddell’s office following a short break, Mr. Reddell informed Mr. Boes he has the opportunity to return to the Carrollton Storeroom today or we can no longer carry him on the payroll. When he stated he could not return to the job, Mr. Reddell informed him we no longer needed his service. Mr. Boes then said he would turn the Storeroom keys in his possession over to Mr. Vanderbrook. He then left Mr. Reddell’s office.”
Subsequent to his dismissal, Boes was declared eligible for Social Security benefits which were made retroactive to October 7, 1977.
Plaintiff argues that the trial court erred both in determining he was not totally and permanently disabled within the meaning of the disability contract and in concluding the medical evidence failed to support his claim of total disability.
The plaintiff further argues his disability is of such nature and degree that he cannot meet the reasonable demands of an employer and also that because of his age, necessity for frequent rest periods, and other factors he is unemployable and cannot engage in any gainful occupation for which he is fitted by education, training and experience. He contends he should, therefore, be declared totally disabled under the NOPSI contract, citing LeBoeuf v. Aetna Life and Casualty Company, 351 So.2d 1266 (La.App. 1st Cir. 1977).
Boes further argues that interpreting ambiguous or vague provisions in a contract there must be strict construction against the drafter, citing Fontenot v. Monsanto Co., 363 So.2d 1309 (La.App. 4th Cir. 1978), and LSA-C.C. art. 1958.
Plaintiff also cites the case of Foret v. Aetna Life & Cas. Co., 337 So.2d 676, 682 (La.App. 3d Cir. 1976), which states:
“Our courts have adopted a policy of liberal interpretation respecting accident insurance policies which provide benefits for total permanent disability, or the inability to engage in any occupation for compensation or profit. Crowe v. Equitable Life Assur. Soc. of United States, 179 La. 444, 154 So. 52 (La.1954). Policy provisions similar to those above referred to have consistently been construed to mean the insured will be denied benefits only when he can perform substantial and material duties of his occupation in the usual and customary manner. That the insured may engage in some other occupation does not disqualify him insofar as concerns policies of this character. * * * ”
Boes also contends that, regarding a disability claim under the Social Security Act, the fact that a claimant has engaged in some work activity or the fact he is not completely helpless will not necessarily disprove his disability, citing Sharbino v. Richardson, 334 F.Supp. 107 (D.C.La.1971), and Prestigiacomo v. Celebrezze, 234 F.Supp. 999 (D.C.La.1964).
Although we do not take issue with plaintiff’s analysis of the above law, we cannot agree with its application to the facts of the instant case.
The medical conclusions of Dr. Brent and Dr. Stokes, presented in their letters sent to NOPSI and reiterated in their testimony at trial, were contradictory in regard to the severity of the plaintiff’s back problems. Since Dr. Stokes had the advantage of a written job description prepared by NOPSI’s Personnel Department, and Dr. Brent had only the plaintiff’s oral description of the physical activities required by his job, we cannot conclude the trial judge erred in giving more weight to Dr. Stokes’ testimony.
The plaintiff, however, contended at trial that the job description given to Dr. Stokes was incomplete because he occasionally lift *593 ed objects weighing more than 50 pounds. However, he also admitted he only did so when his assistant was not in the office and then merely did it out of “common courtesy” to the freight carrier, rather than asking that he wait until the assistant’s return. He also said it was essentially his decision to do this, rather than a specific requirement of his position.
Conrad Lillis, who was Boes’ assistant at the Carrollton storeroom, testified that Boes spent only approximately 15% of a typical working day handling stock and that the greatest part of his time he spent doing paper work. He also said the heaviest object he and Boes would have to climb a ladder to store weighed approximately one pound because the heavier objects were stored toward the ground.
Although Dr. Brent concluded the plaintiff should no longer do any activity which required heavy lifting, squatting, climbing or standing for long periods, there was evidence presented at trial by way of surreptitiously obtained photographs and video tapes of Boes, that he voluntarily carried large objects, and he was photographed actually lifting large items while climbing a ladder onto a Mardi Gras float. Moreover, it was not proven at trial that Boes’ former position required any extensive squatting or standing.
Although Dr. Peterson could not remember having orally communicated with Dr. Stokes prior to receiving Dr. Stokes’ memo of November 11, 1977 (in which he stated his findings) and the date of the plaintiff’s meeting with Reddell and Armbruster (which resulted in his subsequent termination) occurred on November 9,1977, Reddell testified by deposition that he had been informed orally of the findings of Dr. Stokes’ examination prior to the November 9 meeting. Armbruster’s memo regarding the termination also bears this out.
Although NOPSI admits the alternative position of stationery storekeeper was never actually tendered to Boes, this was a result of Dr. Stokes’ conclusion that there was no reason the plaintiff could not continue in his present position. Moreover, Armbrus-ter’s memo states that at the termination meeting the alternative position was mentioned to Boes, who indicated he could not perform in that area either.
In conclusion, therefore, we must agree with the trial court judge, who said in his reasons for judgment:
“The question, then, is whether or not plaintiff has shown by a preponderance of the evidence ‘that he is totally and permanently disabled to the extent that he is unable to perform the duties of his job or engage in any other gainful work for which he is suited or for which he might become qualified, considering his age, physical condition, education, training and work experience.’
“The medical evidence does not support his claim under either alternative.
“Eighty-five percent of his work is performed at his desk and the remainder for the most part is light. Even if he should not be able to tolerate the work of a storeroom supervisor, his experience and physical condition would qualify him for any number of other positions.”
The judgment of the trial court dismissing plaintiff’s suit at his costs is affirmed in all respects.

AFFIRMED.