COLE, Judge.
The question presented on appeal is whether or not it was correct for the trial court to enter a Judgment Notwithstanding the Verdict in an action on an insurance contract finding the plaintiff was not enti- *557 tied to disability benefits, penalties, or attorney’s fees.
The plaintiff, George R. Cannon, filed suit on August 15,1973, naming as defendants his employer, Ormet Corporation, and the Prudential Insurance Company of America. The plaintiff alleged in his petition he was entitled to certain disability insurance benefits provided by his employer through a group disability insurance policy issued by Prudential. In addition, the plaintiff sought attorney’s fees and by supplemental petition statutory penalties.
Prior to trial, the plaintiff dismissed his suit against Ormet Corporation. The suit was tried before a jury beginning on May 13, 1980. On May 16, 1980, the jury rendered the following verdict in favor of the plaintiff (nine votes yes, three votes no):
1. In whose favor do you render judgment, George R. Cannon or Prudential Insurance Company of America?
Verdict: George R. Cannon.
2. If you find George R. Cannon is entitled to judgment, do you find in addition that the Prudential Insurance Company has unreasonably refused to pay disability income to George R. Cannon?
Verdict: Yes.
Thereafter, on July 17, 1980, the trial court signed a judgment embodying the May 16, 1980 jury verdict.
Also, on July 17, 1980, Prudential filed a motion for new trial which was granted by the trial court on August 1, 1980. As a basis, the court provided the jury’s verdict was clearly contrary to the law and the evidence but did not submit detailed written reasons. The plaintiff sought supervisory writs on this issue, however, the writs were denied by this court on June 23, 1981, and ultimately by the Louisiana Supreme Court on September 18, 1981.
On August 9, 1982, the plaintiff filed a motion to recuse the trial judge. Although a hearing was set for March 21, 1983, the parties thereafter entered into a stipulation which dismissed this motion. The stipulation of the parties also allowed the trial court to enter a Judgment Notwithstanding the Verdict on May 22, 1984, and to decree the motion for new trial previously granted by the court on August 1, 1980, be vacated and set aside and that a new trial be granted conditionally.
FACTS
The plaintiff went to work for Ormet Corporation as an instrument mechanic in 1958. In 1960, he was promoted to instrument foreman. As instrument foreman, the plaintiff supervised seven to ten instrument mechanics. Although, the plaintiff would spend approximately 60% of his time in his office, twice a day he was required to walk throughout the plant site supervising the work of his subordinates. As well, in emergencies, the plaintiff was required to respond with alacrity to the emergency site.
During several months in 1966 and 1967, the plaintiff was prevented from working due to an attack of angina pectoris which manifested itself as severe chest pains. This condition was treated by Dr. William M. Luikart. By letter dated September 25, 1967, Dr. Luikart advised Ormet Corporation the plaintiff was “quite able to resume his regular duties at this time.” Upon resuming his regular duties the plaintiff’s employment records show he missed work due to sickness one day in 1968, one day in 1969, one day in 1970, thirteen days in 1971 and two days in 1972.
The plaintiff’s attending physician from July 1969 through October 1972, was Dr. James Calvin. Dr. Calvin examined the plaintiff on January 27, 1972. He testified as follows:
“Q. All right. Back on January 27, 1972, you found his tests to be normal on that date?
A. Right. Cardiogram was normal; chest x-ray was good; physical examination satisfactory.
Q. Blood pressure was normal?
A. 160/80. The systolic was slightly elevated, but, again, of no concern.
Q. Did you recommend at that time that he not go back to work?
A. No.
*558 Q. Did you—
A. I asked him to call back in one week.
Q. Did you tell him to restrict his activities at all at that time?
A. No, he said he wasn’t having any chest pains at that time.
Q. Well, then, your feeling at that time, from a medical standpoint, is that he was able to perform the duties of his occupation that he had expressed to you?
A. In so far as I understood it, yes. Because I do not have here, ‘Off work for a week, for five days, for two days.’ ”
On February 2, 1972, the plaintiff, after sending his men out on the job, was summoned by Mr. Thomas Barfield, the instrument supervisor, into Mr. Barfield’s office. Also present in the office were Mr. Bob Duncan, instrument superintendent, Mr. Paul Courrege, who at that time was manager of production and maintenance and is now plant manager; and, according to plaintiff, Mr. M.S. Sullivan, a supervisor.
The purpose of the meeting was to inform the plaintiff Mr. Barfield believed him to be under the influence of alcohol while on the job. The plaintiff sharply denied such an accusation. According to plaintiff’s deposition:
“They called me back in, and then Paul Courrege said, ‘George, we have talked about this situation and we want you to take a couple of days off until we can further discuss the situation.’ And I asked Paul Courrege, I said, — and this is almost word for word. I said, ‘Paul, — ’ —I said, ‘ — this is kind of embarrassing to me.’ I said, ‘The people out in the yard are going to wonder what’s going on.’ I said, ‘Am I fired or dismissed,’ and he said, ‘No.’ He said, ‘We just want you to go home a few days and we’ll get back in touch with you.’ ”
The plaintiff did not work for Ormet Corporation again after February 2, 1972.
Thereafter, on February 14, 1972, the plaintiff was re-examined by Dr. Calvin. Dr. Calvin testified this was a normal examination; however, because of subjective complaints he ordered an exercise electrocardiogram. The results of this March 9, 1972 testing revealed the plaintiff’s readings were within normal limits.
On March 20, 1972, the plaintiff attended a meeting with Mr. Charles Jacques, then the Division Manager of the Alumina Division and now Vice-President of Ormet Corporation, and Mr. Louis 0. Buuck, the Manager of Industrial Relations. The plaintiff requested the meeting to discuss his reinstatement. Mr. Buuck testified the plaintiff appeared to be in good health and asserted he felt fine and never felt better. Mr. Jacques states at no time did the plaintiff assert he could not resume working because of his health. The plaintiff was not reinstated.
THE INSURANCE CONTRACT
It is well settled the contract of insurance, like every other contract, is the law between the parties. Every provision must be interpreted as written when they are clear and unambiguous. Southern States Masonry v. Mission Ins. Co., 353 So.2d 307 (La.App. 1st Cir.1977), writ denied, 354 So.2d 1376 (La.1978). In particular, there is no standard definition of disability. One must look to the policy for guidance. Winn State Bank & Trust Co. v. Browning, 453 So.2d 286 (La.App. 2d Cir.1984).[1] Therefore, a careful examiná *559 tion of the group disability insurance policy issued by Prudential must be made.
On the basis of our examination we find the following provisions to be pertinent to the present case:
“DEFINITIONS
[[Image here]]
‘Injury’. — ‘Injury’ means only accidental bodily injury.

‘Total Disability’.

(a) During the portion of any period of disability not exceeding the Initial Duration (schedule determination), ‘total disability’ means the complete inability of the Employee due to sickness or injury to perform any and every duty pertaining to his occupation with the Policyholder; and
(b) during the remainder, if any, of the period of disaability, ‘total disability’ means the complete inability of the Employee due to sickness or injury to engage in any and every gainful occupation for which he is reasonably fitted by education, training or experience.
In no event, however, shall ‘total disability’ exist for any purpose of this Rider during any period in which the Employee (i) is engaged in his or any other gainful occupation, or (ii) is confined in a penal institution or other house of correction as a result of conviction for a criminal or other public offense.
BENEFIT PROVISIONS
Part 1. Benefit For Loss of Time During Total Disability due to Sickness. —If a period of total disability of an Employee due to sickness commences while the Employee is insured under this Rider and if such total disability requires the regular care of a licensed physician, the Insurance Company will, subject to the provisions hereinafter stated, periodically pay to the Employee the Adjusted Monthly Income Benefit (schedule determination) applicable to the Employee for each month (the applicable portion of the Adjusted Monthly Income Benefit for any period not constituting a full month) throughout which such total disability continues beyond the Elimination Period (schedule determination). Benefits shall not be payable for longer than the applicable Maximum Duration of Monthly Income Benefits (schedule determination), nor in any event after the applicable Benefit Expiration Date (schedule determination).
⅝ ⅞: ⅝ !⅜ ⅝ ⅝
TERMINATION OF INDIVIDUAL INSURANCE
An Employee’s insurance under this Rider shall automatically terminate
(a) if his employment terminates as defined below, or
(b) if he ceases to be a member of the classes of Employees eligible for insurance under this Rider, or
(c) upon his attainment of the Limiting Age (schedule determination), or
(d) if this Rider terminates, or
(e) if he fails to make, when due, any required contribution, or
(f) if Employee Basic Insurance (schedule determination) terminates for any reason.
Termination of employment shall, for all purposes of this Rider, be deemed to occur when an Employee ceases to be actively engaged in work on a full-time basis with the Policyholder. However, an Employee who is disabled, other than by disability for which benefits are not provided under this Rider by reason of the provision ‘Exclusions and Exceptions’ of the ‘Benefit Provisions’, or who is granted a leave of absence, temporarily laid off, or placed on a part-time employment basis will nevertheless be considered as still employed on a full-time basis until the Policyholder, acting on a basis precluding individual selection, terminates the Employee’s insurance by notifying the Insurance Company to that effect or by discontinuing premium payments for his insurance, but in no event shall the insurance on any such Employ *560 ee be continued beyond any limit specified below:

Reason for Cessation of Work on a Full-Time Basis

Leave of absence, temporary lay-off or part-time employment for reasons other than disability.
Part-time employment because of disability for which benefits are not provided under this Rider by reason of the provision ‘Exclusions and Exceptions’ of the ‘Benefit Provisions’.

Limit Referred to above

End of policy month following policy month during which such leave, lay-off or part-time employment commences.
Commencement of such part-time employment.
The insurance under this Rider on any Employee who has ceased to be actively engaged in work on a full-time basis with the Policyholder for any reason shall, if not previously terminated in accordance with the foregoing provisions hereof, immediately terminate if, while not engaged in work on a full-time basis with the Policyholder, the Employee is engaged in any gainful occupation other than employment with the Policyholder.”
These provisions give rise to two issues: First, whether the plaintiff’s coverage was terminated by virtue of the policy provisions; second, whether the plaintiff has established he was totally disabled within the policy definitions before a termination of the coverage.
JNOV
The JNOV granted by the trial court, based on the stipulations of the parties, was done without any written reasons. However, to grant a JNOV the trial court had to find the evidence pointed so strongly and overwhelmingly in favor of Prudential that reasonable men could not have arrived at a contrary verdict on the facts at issue. Menard v. King, 469 So.2d 15 (La.App. 1st Cir.1985).
The plaintiff testified that on February 2, 1972, he was told by Mr. Courrege, “We just want you to go home a few days and we’ll get back in touch with you.” In addition, Mr. Courrege testified as follows:
“Q. On February 2, 1972, Mr. Courrege, did you tell George Cannon, after he asked you the question, ‘Am I terminated?’ Did you tell him he was not terminated?
A. I can’t remember the specific words; but what happened is, we sent George home and told him we would be in contact with him. He was not terminated there on the spot.”
Therefore, on February 2, 1972, the plaintiff was not terminated, but only suspended temporarily.
Accordingly, the policy provides such a temporary hiatus does not preclude coverage, subject to a specified time limit, unless the employer notifies the insurance company of termination of coverage or premium payments are discontinued. The plaintiff’s pay stub for February 1972, reflects a premium for the entire month was paid.[2] As well, the defendant has introduced no evidence to establish they were notified to terminate coverage for the plaintiff. Thus, the plaintiff remained covered by the policy after the February 2, 1972 meeting. However, Mr. Buuck testified:
“Q. Did you speak with Mr. Cannon after his termination?
A. I spoke with George on February 7, which was the following Monday.
Q. And what was the subject of that discussion?
A. I called to tell him that it had been decided to terminate him effective February 2; that he would be given five months’ severance pay, and would also receive his four weeks of regular vaca *561 tion, plus his 2.5-week supplemental pay.”
This testimony was not contradicted by plaintiff.[3] Therefore, because the plaintiff was actually terminated from his employment on February 7, 1972, this is the date the policy dictates coverage is terminated and the date plaintiff is no longer “an insured.”
The policy requires a period of total disability due to sickness must commence while the employee is an insured under the policy before benefits will be provided. Therefore, the plaintiff was required to establish he was totally disabled within the policy definitions, on or before February 7, 1972, to be entitled to benefits.[4]
Initially, total disability is defined in the policy as “the complete inability of the Employee due to sickness or injury to perform any and every duty pertaining to his occupation with the [employer].” (Underscoring ours.) However, such a definition would require a state of absolute helplessness to establish total disability and has been routinely reinterpreted by our courts.
In Crowe v. Equitable Life Assur. Soc., 179 La. 444, 154 So. 52 (1934), the court pronounces,
“... But be that as it may, we think that the true rule governing cases of this kind is stated in 7 Couch on Insurance, § 1670, p. 5769, as follows, viz.:
‘ * * * It may be said, generally speaking the provisions in life, health and accident insurance policies for indemnity in case the insured becomes totally, permanently or wholly disabled, etc., do not require that he shall be rendered absolutely helpless, but, rather, merely requires such disability as renders him unable to perform the substantial and material acts of his business or occupation in the usual and customary way. At least such a rule has been in substance adhered to, where the policies required that he be totally disabled from transacting any and every kind of business. * * *'
The rule is stated in 14 R.C.L., § 491, p. 1315, as follows, viz.:
‘The rule prevailing in most jurisdictions is that the total disability contemplated by an accident insurance policy does not mean, as its literal construction would require, a state of absolute helplessness which can result only from loss of reason, since as long as one is in full possession of his mental faculties he is capable of transacting some part of his business, whatever it may be, although he is incapable of physical action. On the contrary, these courts, giving consideration to the object of the contract, hold that the “total disability” contemplated *562 by the agreement is inability to do substantially all the material acts necessary to the prosecution of the insured’s business or occupation in substantially his customary and usual manner.’
The rule thus announced is supported by the weight of authority in England as well as in this country. See Order of United Commercial Travelers v. Barnes, 72 Kan. 293, 80 P. 1020, 82 P. 1099 [ (1905) ], 7 Ann.Cas. 815; Metropolitan Life Ins. Co. v. Blue, 222 Ala. 665, 133 So. 707, 79 A.L.R. 857 [ (1931) ].
The rule was followed by the Court of Appeal, First Circuit, in the case of Manuel v. Metropolitan Life Ins. Co., to which we have hereinabove referred. There the court held, in interpreting in a health and accident policy the provision ‘totally and permanently disabled * * * to perform any work or engage in any business for compensation or profit,’ that an insured permanently disabled by disease was within the provision, notwithstanding that, sitting in his room, he consulted and advised with his tenants concerning crops, drove his automobile about four or five miles to town once a week to confer with bank officials concerning his financial affairs, and took his children to neighborhood dances.” 154 So. at 54, 55.
Therefore, the initial definition of total disability shall be construed to mean the insured will be denied benefits only when he can perform substantial and material duties of his occupation in the usual and customary manner. Foret v. Aetna Life & Cas. Co., 337 So.2d 676, 682 (La.App. 3d Cir.1976).
In addition, this policy sets forth a further definition of total disability not encountered in the prior jurisprudence. The policy provides, “In no event, however, shall ‘total disability’ exist for any purpose of this Rider during any period in which the Employee (i) is engaged in his or any other gainful occupation_” (Underscoring ours.) This definition precludes a finding of total disability when an employee is engaged in his occupation.
The evidence introduced in the trial court established plaintiff worked at his job from 1967 through February 2, 1972 and was paid for this work.[5] Thus, the specific preclusion of the above policy provision applies to prevent the plaintiff from establishing he was totally disabled at any time prior to February 2, 1972. If the plaintiff is precluded from showing he was totally disabled for any period during which he was “engaged in his ... occupation,” then he is not entitled to any benefits for that period as a matter of law, thereby justifying the grant of a JNOY for this period.
As to the period from February 2, 1972 to February 7, 1972, at which time plaintiff’s coverage under the policy terminated, the standard for determining total disability is the Foret standard (during this period the plaintiff was not engaged in his occupation, instead he was temporarily laid off). To establish total disability, the Foret standard requires an employee show he is not able to perform the substantial and material duties of his occupation in the usual and customary manner.[6] Although, the jury verdict reflects they believed the plaintiff could not perform his job, the trial court granted a JNOY. For the trial court to grant such a JNOV, the court must have found reasonable men could not have believed the plaintiff was unable to perform his job from February 2, 1972 to February 7, 1972.
In determining whether a JNOV is appropriate the trial court may not substitute its own credibility evaluations for that of the jury. Menard v. King, supra. However, our review of the record reveals *563 the trial court did not make such a substitution. The evidence introduced by the plaintiff is not sufficient to establish total disability under the Foret standard. Although Mr. N.J. Madere, assistant to the plaintiff, stated he performed some of the plaintiff’s physically demanding functions, such as climbing large amounts of stairs, he also testified the plaintiff otherwise performed his job. Mr. Madere testified as follows:
“Q. And he was on his job most days.
A. Right.
Q. You felt he was pretty regular coming to work.
A. Right.
Q. And he performed his job; is that right?
A. Except for any strenuous job, because anything that was strenuous, he couldn’t — that was—
Q. Well, his primary duty was to supervise the instrument mechanics; is that correct?
A. Right.”
In fact, the plaintiff performed his job for five continuous years without any question of his ability until February 2, 1972, at which time his supervisors believed him to be under the influence of alcohol on the job.[7] Additionally, both the medical testimony of the plaintiff’s treating physician and the plaintiff’s own admission of his physical condition establish the plaintiff was not totally disabled from February 2, 1972 to February 7, 1972.
Dr. Calvin testified both prior to and after February 7, 1972, the plaintiff could perform his job as he had for the past five years. Physically, the plaintiff’s condition had remained unchanged from February 2, 1972 to February 7, 1972. As well, during the March 20, 1972 reinstatement hearing, the plaintiff stated he was feeling fine and able to return to his job. This combination of objective and subjective factors strongly and overwhelmingly points to the plaintiff being able to perform substantial and material duties of his job. Therefore, a reasonable jury could not have found the plaintiff entitled to benefits. The trial court was correct in granting the JNOV and is affirmed.[8]
The plaintiff is case for all costs of these proceedings.
AFFIRMED.

. The plaintiff assigned as error the trial court’s exclusion of any reference to and all evidence of the disability payments the plaintiff received from Social Security. However, the standard for total disability according to Social Security is purely a medical standard set forth in plaintiff’s proffer number two as follows:
“Angina pectoris (as defined in § 4.00D) associated with standardized ECG exercise test abnormalities (see § 4.00E) in the absence of digitalis (in the presence of digitalis, the predigitalis ECG should be evaluated), showing one of the following:
A. Development of depression ST segment to more than 0.5 mm. which lasts for at least 0.12 seconds and appears in at least 2 consecutive complexes in any lead; or
B. Development of bundle branch block.” It is obvious this standard has no bearing on the standard provided in the policy which is based upon job performance. Therefore, this assignment of error is without merit.

. Since the premium was paid for the entire month, but coverage was terminated on February 7, 1972, the plaintiff could be entitled to a return of part of the premium. However, plaintiffs petition does not request such relief.

. The plaintiff argues August 18, 1972 was the date of his termination from Ormet Corporation. As a basis for this argument, he introduced an application for vested retirement benefits filled out by the Local Personnel Officer of Ormet which showed August 18, 1972 as the termination date. As well, the plaintiff received his full-time pay to August 18, 1972. However, it is obvious that when five months severance pay, four weeks of regular vacation pay and two and one-half weeks of supplemental pay are paid out as of February 2, 1972, they would last until August 18, 1972. Mr. Buuck’s testimony that he notified plaintiff on February 7, 1972 of his termination effective February 2, 1972 remains uncontradicted. In addition, the pay stub for August 18, 1972, has no deduction for disability premiums evidencing no coverage at that juncture.

. The contention by plaintiff that the policy must be interpreted to provide benefits for total disability due to a sickness which begins to assert itself during the period of employment but is not yet totally disabling within that period is without merit. The policy clearly provides the period of total disability, due to sickness, must commence while the employee is an insured under the policy. A terminated employee is ordinarily not an insured under the policy. To allow otherwise would increase the liability exposure anticipated by the insurance company. The premiums are set based on actuarial risks. To allow recovery of benefits for total disability arising out the employment but manifested after termination of employment would factor in another risk which the parties to the insurance contract in this instance did not intend or anticipate. Such an interference with the free will of these parties is not a proper function for this court. In addition, the testimony of Dr. Ira L. Hewitt can not be afforded any weight by this court because it is irrelevant. Whether or not the plaintiff was disabled in 1976 was not an issue before the trial court.

. Although "engaged in his ... occupation ...” is not defined by the policy, this court notes an employee who comes to work nearly every day for five years and is paid for these five years work must satisfy the standard under any feasible definition.

. The record does not contain the trial court’s charge to the jury. This court must assume the Foret standard or a similar one was given to the jury because neither counsel has raised an objection on this point for purposes of determining the correctness of the JNOV.

. Several of the Ormet employees whom the plaintiff supervised testified they never saw the plaintiff under the influence of alcohol at work and particularly not on February 2, 1972. However, whether the plaintiff was under the influence of alcohol or not has no bearing on the plaintiffs entitlement to disability benefits. No evidence or allegation the plaintiff was terminated because of his sickness has been presented or made. Only such proof would bear on plaintiff s entitlement to disability benefits. Cf. Jones v. Prudential Ins. Co. of America, 415 So.2d 223 (La.App. 2d Cir.1982).

. Our affirmation of the grant of the JNOV by the trial court pretermits the determination of whether the new trial should have been granted conditionally or not.